# REDACTED OPINION

# In the United States Court of Federal Claims

No. 13-616C
Filed: March 14, 2014
Redacted Version Issued for Publication: April 4, 2014[1]

```
* * * * * * * * * * * * * * * * *
FCN, INC.                       *
                                *        Post-Award Bid Protest; Air
              Plaintiff,        *        National Guard; Mass Notification
      v.                        *        System; Price Realism;
                                *        Government-Furnished Property;
UNITED STATES,                  *        Injunction.
                                *
              Defendant.        *
                                *
* * * * * * * * * * * * * * * * *
```

**William T. Welch**, Law Offices of McMahon, Welch & Learned, Reston, Virginia, for plaintiff.

**J. Bryan Warnock**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Bryant G. Snee**, Acting Director, Commercial Litigation Branch, and **Stuart F. Delery**, Assistant Attorney General. **Kyle Chadwick**, Trial Attorney, Contract and Fiscal Law Division, United States Army Legal Services Agency, of counsel.

## O P I N I O N

### HORN, J.

The protestor, FCN, Inc. (FCN), filed a post-award bid protest in this court challenging the Air National Guard's award of a contract for a "Mass Notification System/Net-Centric Alerting System" (Mass Notification System) to Reliable Government Solutions, Inc. (RGS)[2] pursuant to Solicitation W9133L-13-R-0015 (the

---

[1] This opinion was issued under seal on March 14, 2014. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed and some additional redactions, although not proposed by the parties, are added in the interest of consistency. Words which are redacted, are reflected with the following notation: "[redacted]."

[2] RGS did not intervene in the above captioned protest. The court notes that although the parties refer to RGS as "Reliable Government Solutions, Inc.," which is the entity

Solicitation).  Before filing suit in this court, FCN filed a protest with the Government Accountability Office (the GAO), which was denied.  In this court, the protestor states: "The FCN proposal received the highest ranking for all non-price factors outlined in the RFP [Request for Proposal]."  Therefore, the protestor alleges that the Air National Guard contracting officer awarded the contract to RGS in violation of the Federal Acquisitions Regulations (FAR) by: (1) "accepting a proposal that relied on RGS's offer to utilize Government Furnished Equipment (GFE)," (2) "accepting RGS's offer to submit a 'no cost' licensing fee and 'no-cost' telephony communications previously provided to the U.S. Air Force under a previous contract," (3) "failing to perform a proper price realism analysis on the proposal of RGS and its subcontractor AtHoc," and (4) "allowing the RGS proposal to violate the stated proposal instructions by including pricing information in its technical proposal."  To the extent the current Solicitation violates the applicable procurement regulations, the protestor asks the court to enjoin implementation of contract W9133L-13-P-0034, awarded to RGS under the Solicitation, and order the government to re-evaluate the existing proposals.[3]  The protestor also seeks any other relief the court deems appropriate, including, but not limited to, attorney's fees and the costs of maintaining the protest.  The parties fully briefed cross-motions for judgment on the administrative record and oral argument was held.

## FINDINGS OF FACT

Pre-Solicitation History

On September 22, 2012, the Air National Guard issued solicitation W9133L-12-R-0073 (the subsequently cancelled solicitation), under the work statement "*Desktop Alert (DTA) Build-out*."  (emphasis in original).  The subsequently cancelled solicitation's due date was listed as September 26, 2012.  The parties stipulated that the subsequently cancelled solicitation was for the procurement of "hardware and software to expand the ANG's [Air National Guard's] Desktop Alert (DTA) environment."  The parties have stipulated that "Desktop Alert is a Mass Notification System/Net-Centric Alerting System (MNS/NCAS) created and sold by Desktop Alert, Inc."  On September 28, 2012, Ly Tran, Vice President of AtHoc, Inc. (AtHoc), a competitor of Desktop Alert, sent an e-mail to contracting specialist Willie L. Holmes objecting to the subsequently

---

that was awarded the contract, the agency and the GAO, at times, refer to RGS as "RGS Federal Inc."

[3] FCN filed a motion for preliminary injunction to stay implementation of the contract awarded to RGS, contract W9133L-13-P-0034.  In an unopposed motion for extension of time to respond to the protestor's filing, defendant stated, however, that: "The contract in this case has already been awarded, but the procuring agency has assured counsel that it will continue to stay performance until the Court issues its opinion."  Furthermore, in its motion for judgment on the administrative record, the protestor indicated that by agreement of the parties, the court consolidated FCN's request for preliminary injunction with its request for permanent injunction and declaratory relief.

cancelled solicitation's requirement to use Desktop Alert, and alleging that it was a waste of taxpayer funds and encouraged unfair competition. Mr. Tran stated in his e-mail: "We vehemently protest the Solicitation W9133L-12-R-0073 for the fielding and sustainment of Desktop Alerts across the Air National Guard." Mr. Tran claimed in the e-mail that "the Government needs to open up this sonication [sic] to new competition for new vendors such as AtHoc." He listed some of the purported advantages of using AtHoc's software, including that "AtHoc is already deployed across 120+ US Air Force bases," and that the "US Air Force already purchased licenses for ALL USAF [United States Air Force] INCLUDING ANG (!)." (capitalization and punctuation in original). Mr. Tran also asserted in his e-mail that:

> Furthermore the USAF negotiated an UNLIMITED USAGE for its alerting capability including no cost for any phone call or text message or email or desktop alert sent. Last USAF [sic] already purchased a pool of lines to be available for ALL USAF (including ANG) of over [redacted] lines. By not providing AtHoc the ability to complete [sic] for this solicitation, ANG will not benefit from all that the USAF ALREADY PAID FOR!

(capitalization in original).

On October 8, 2012, Clayton S. Marsh, counsel to AtHoc, submitted a supplement to the AtHoc objections to the subsequently cancelled solicitation (W9133L-12-R-0073). Mr. Marsh offered a number of additional arguments as to why the subsequently cancelled solicitation was flawed. Mr. Marsh stated that the synopsis of the announcement was incorrect, claiming that "[t]he FBO [Federal Business Opportunities] announcement described this procurement as 'DESKTOP ALERT SUSTAINMENT AND SUPPORT' . . . . In truth, the Solicitation is for a massive build-out of a new hardware and software implementation of Desktop Alert." (capitalization in original). Mr. Marsh also stated that the "FBO announcement allowed only one day to respond. It was posted September 27, at 10:06 a.m., and required offers by noon on September 28."[4] Mr. Marsh continued that "[t]here are no '[f]actors and significant subfactors that will be used to evaluate the proposal and their relative importance' as minimally required by FAR [Federal Acquisition Regulation] 15.203(a)(4)." Mr. Marsh also stated that "the specific materials needed to fully respond are indicated (repeatedly) to be in the 'attached LOM' [list of materials] – which is not attached.'" Additionally, Mr. Marsh claimed that there was a potential conflict of interest due to unequal access to information, and that the National Guard Bureau had already purchased a "DTA [Desktop Alert] software alert system, covering '**all personnel in the Guard at the Air and Army Guard HQs** . . . .'" (emphasis in original).[5] Mr. Marsh

---

[4] Although Mr. Marsh claimed the subsequently canceled solicitation provided only a one day turnaround, the first page of the subsequently cancelled solicitation states that it was issued September 22, 2012 and that proposals were due by September 26, 2012.

[5] Also in the record is a chart in which AtHoc compared the subsequently canceled solicitation to a prior July 21, 2009 Air National Guard solicitation, W9133L-09-F-0139,

further commented on the availability of AtHoc's system throughout the United States Air Force and stated, "the existing Air Force purchase and installation of AtHoc's system for desktop, telephony, email, and text alerting includes [redacted] Telephone Alerting lines available to Air National Guard.  Through more than 20 different contracts, the Air Force has purchased licenses from AtHoc totaling 700,000 users."  In the Marsh e-mail were copies of e-mails and sections of Air Force - AtHoc contracts in support of AtHoc's position.

On October 11, 2012, Anthony Mara of the National Guard Bureau sent an e-mail asking Air Force Colonel Rigel Hinckley for comments regarding AtHoc's allegations. Colonel Hinckley responded, as follows:

> The truth has been stretched to the point where it can no longer be discerned from wild promises or innuendos.  We currently do not have a license agreement that allows existing AtHoc licenses to be used wherever we want. DTA 4.x and 5.x are both currently going through certification and will not be turned off.
>
> The unfair competition should be used against AtHoc for their attempt to acquire the Enterprise contract without competing for it.  The EIS [Enterprise Information System] PMO [Program Management Office] continues to work through the Enterprise contract award.

Nonetheless, on November 7, 2012, the Air National Guard sent a letter to AtHoc stating that the Air National Guard will "either list 'Brand Name or Equal' requirements, with salient features or will remove the vendor specific information and/or still add salient features for use in determining 'Best Value Technically/Price Acceptable' trade-off criteria."  According to the parties' joint stipulation, on the same day, November 7, 2012, the Air National Guard "took corrective action by cancelling Solicitation No. W9133L-12-R-0073."[6]

---

also for an "Integrated Electronic Alert Notification Software Solution (EANS) Access NCB. . . ."

[6] Although not implicating the Air National Guard's subsequently cancelled solicitation or the current Solicitation at issue, in 2013 the Defense Contract Management Agency (DCMA) issued a similar solicitation for emergency mass notification software, products and services.  See Desktop Alert, Inc., B-408196, 2013 WL 3803965 (Comp. Gen. July 22, 2013).  In 2009, in response to a Department of Defense Instruction, which required defense agencies to "maintain a mass warning and notification capability to warn immediately all personnel if there is a dangerous incident or condition in the workplace," DCMA awarded RGS a contract to provide "a product known as the AtHoc Mass Notification System . . . this contract included requirements for: software; licenses; core system; software assurance; upgrades and technical support; 50 dedicated phone lines for transmitting alerts; system installation and set-up; and a back-up system."  Id.  at *1. The RGS contract with DCMA ended on April 12, 2013, and in March of 2013, DCMA issued a solicitation which was limited to AtHoc products and services, and restricted

On February 21, 2013, the Air National Guard issued solicitation, W9133L-13-R-0015, the Solicitation at issue in the above captioned protest.  As stipulated by the parties, the Solicitation's "**Program Goal**" (emphasis in original) was for a Mass Notification System/Net-Centric Alerting System "that would allow the ANG to rapidly and reliably inform personnel about anti-terrorism/force protection conditions (FPCON) (including chemical, biological, radiological, and nuclear threats), hazardous weather conditions, and other critical events."  The Solicitation listed as: "**Program Objectives**:"

> A. The NCAS [Net-Centric Alerting System] shall be capable of sending alert messages to end-users (recipients) via multiple delivery methods, including:
>> a. Audio-visual network alerts to desktops and laptops via desktop pop-up
>> b. Text alerts to mobile phones and pagers
>> c. Text alerts to electronic mail (e-mail) clients
>> d. Audio alerts to phones

the competition to authorized AtHoc resellers.  Id.  The solicitation sought AtHoc software, upgrades, security patches, software assurance, technical support, communication services, telephony and training.  RGS was the only offeror to submit an offer to DCMA.  Id.

Desktop Alert filed a pre-award protest with the GAO, alleging DCMA failed to consider mass notification systems offered by other vendors and that "the solicitation's limitation of sources to AtHoc brand name items is unduly restrictive of competition, and that the solicitation fails to describe the agency's minimum requirements."  Id. at *2.  The GAO found

> that DCMA failed to justify the use of the restrictive brand name requirements for this procurement. Specifically, we conclude that the agency's justification is deficient because DCMA failed to adequately define the supplies or services required to meet its needs, or any essential feature of the supplies or services that is unique to the AtHoc brand name. We also conclude that the justification is deficient because the agency failed to document adequately its market research of other vendors' similar products.

Id. at *4.  Therefore, the GAO concluded "that the solicitation was overly restrictive," and sustained the protest.  Id.

Despite arguing to the Air National Guard that the subsequently cancelled solicitation's requirement to use Desktop Alert encouraged unfair competition and was a waste of taxpayer funds, AtHoc intervened in the Desktop Alert protest at the GAO in support of DCMA's solicitation restricting the competition only to authorized resellers of AtHoc products and services.

      e. Audio alerts to existing indoor/outdoor PA [Public Address]/giant voice systems

      f. Network alerts to XMPP[Extensible Messaging and Presence Protocol]-based Chat rooms or any other IP[Internet Protocol]-connected devices via standard XML [Extensible Markup Language] and CAP [Common Alerting Protocol] protocols

B. The NCAS shall be capable of sending alert messages to target recipients according to:

      a. Hierarchical organizational structure (as would be imported from an LDAP [Lightweight Directory Access Protocol] or Active Directory)

      b. Organizational roles

      c. Specific distribution lists (e.g., hazardous materials (HAZMAT) response teams)

      d. Dynamic groups created through on-the-fly queries of the user directory

      e. Geographical locations (e.g., entire bases, zones within bases)

      f. IP address

C. The NCAS must be capable of interoperability with other notification systems and organizations hosting those systems, for example, but not limited to NOAA [National Oceanic and Atmospheric Administration], FEMA [Federal Emergency Management Agency] and Army National Guard through Common Access Protocol (CAP)

D. The NCAS shall be able to centrally track, in real-time, all alerting activities for each individual recipient, including sending, receiving, and responding to alerts, and be able to generate reports based on tracked information

E. The Air National Guard Enterprise Network (ANGEN) is comprised of VMware virtual server infrastructure; therefore any NCAS solution must leverage virtualization.

      a. Exclusion: 2 ANG Locations require NCAS be installed on existing physical servers

(emphasis in original).

      According to the parties' joint stipulation, the Solicitation "contained firm-fixed-price line items (CLINs) for labor, materials, travel and other direct costs. It included a base performance period of 12 months with two 12-month options for sustainment support." (internal citations omitted). Randall Wilson was the Air National Guard contracting officer and source selection official responsible for the Solicitation. Mr. Wilson stated under oath on June 21, 2013, during the FCN's protest to the GAO of the Solicitation at issue before this court: "Our agency purposely expressed our

requirements as a 'Statement of Objectives,' in order to clearly describe the capability that the Government was seeking while providing flexibility to the offerors to provide the Government with their unique solutions to our requirement."  The Solicitation also listed as "**Considerations**:"

    A.  Acceptable proposals must include the ability to rapidly and reliably provide the NCAS program objectives to all users within the ANGEN [Air National Guard Enterprise Network] to include main operating bases and geographically separated units.
        a.  Exclusion: Host bases with tenant ANG organizations are responsible for providing NCAS to those ANG units within the host base area of responsibility

    B.  Leveraging existing resources/capabilities to achieve program objectives could be included in the offeror's proposal

    C.  All aspects of the proposed solution (hardware/software) must:
        a.  Comply with applicable DISA [Defense Information Systems Agency] STIGS [Security Technical Information Guides]
        b.  Have approval to connect to DOD [Department of Defense] networks
        c.  Must meet DOD/AF certification and accreditation criteria

(all emphasis in original).  Under the Solicitation's "DELIVERY INFORMATION" section, a chart titled "SERVICING UNITS," (emphasis and capitalization in original), lists the projected population to receive information from the Mass Notification System by Air National Guard Wing and by geographically separated unit.  The Air National Guard, in a response to questions from interested bidders, stated that [redacted] users would require e-mail notifications, [redacted] users would require text message access, and [redacted] workstations would need to receive desktop alerts.  In an April 2, 2013 questionnaire sent by the Air National Guard to the offerors in the competitive range, discussed below, offerors were instructed that all proposals should cover the total population of the Air National Guard, which was estimated to be [redacted] personnel at that time.  Although the stated goal in the Solicitation at issue before this court was for rapid notification of Air National Guard personnel, neither the Solicitation's "**Program Objectives**," nor "**Considerations**," set a time limit by which a specified number of service members would have to be alerted or a rate of service members to be alerted over time.[7]  (emphasis in original).

---

[7] This represented a change from the subsequently cancelled solicitation, W9133L-12-R-0073, which required a Mass Notification System that could "ensure all members of the ANG can be contacted within 10 minutes of an event."

The Solicitation currently under review stated:

The award will be made based on the best overall (i.e., best value) proposal that are [sic] determined to be the most beneficial to the Government, with appropriate consideration given to the four (4) evaluation factors.   Award will be made to the offeror whose proposal is most advantageous to the Government based upon an integrated assessment of the evaluation factors and sub-factors described below. The Government intends to determine best value by conducting a trade-off analysis of Price and Non-Price factors with respect to the relative order of importance described in paragraph M.3.

The Solicitation listed the evaluation factors as: (I) "MISSION CAPABILITY," (II) "PAST PERFORMANCE," (III) "SMALL BUSINESS PARTICIPATION," and (IV) "PRICE." (capitalization in original).  The relative order of importance of the four evaluation factors was described as:

a) The Mission Capability Factor is More Important than the Past Performance Factor.

b) The Mission Capability Factor is Significantly More Important than the Small Business Participation Factor.

c) The Past Performance Factor is More Important than the Small Business Participation Factor.

d) The Past Performance Factor and Small Business Participation Factor are each More Important than the Price Factor.

e) All non-Price evaluation factors, when combined, are More Important than the Price Factor.

According to the Solicitation's "**EVALUATION APPROACH**," the proposals were to be evaluated to determine if they "adequately and completely considered, defined, and satisfied the requirements specified in the RFP." (emphasis and capitalization in original).  The Solicitation further stated:

The proposal will be evaluated to determine the extent to which the proposed approach is workable and the end results achievable. The proposal will be evaluated to determine the extent to which successful performance is contingent upon proven devices and techniques. The proposal will be evaluated to determine the extent to which the offeror is expected to be able to successfully complete the proposed tasks and technical requirements within the required schedule.

When discussing the price factor, the Solicitation stated:

The Total Contract Life Price will be evaluated for completeness, accuracy, reasonableness and realism, using the techniques in FAR 15.404-1(b)(2). A determination will be made as to whether the Offerors have completed all aspects of the price proposal properly and whether the amounts listed in the price proposal are calculated accurately. No adjectival ratings will be used to evaluate Price.

1) The RFP requires firm-fixed-prices [sic] contract line items.  A price reasonableness approach will be utilized by the Government to determine that the proposed prices offered are fair and reasonable and that a "buy-in" or unbalanced pricing between CLINs or Option Periods is not occurring. In evaluating price reasonableness, other than cost and pricing data, may be requested and utilized if the Contracting Officer cannot determine reasonableness through initially submitted pricing information. Indications of potential underbidding or unbalanced pricing will be reflected in the cost/pricing report and may impact the ratings for non-price factors as such indications may be determined to indicate a lack of understanding of the requirement.

2) The Government will examine price proposals for artificially low unit prices.  Offers found to be unreasonably high, unrealistically low (an indication of "buy–in"), or unbalanced, may be considered unacceptable and may be rejected on that basis.

3) Evaluation of Options.  The Government may determine that an offer is unacceptable if the option prices are significantly unbalanced.

According to the Solicitation, "reasonableness, other than cost and pricing data," could be considered in evaluating both the price and non-price factors.

The Solicitation instructed offerors to arrange their proposals into five volumes. Each of the first four volumes was to be dedicated to discussing one of the four evaluation factors, mission capability, past performance, small business participation, and price, respectively, and the fifth was to contain completed solicitation forms, surveys, certifications, and representations.  The Solicitation made clear, in bold font, that: "**No pricing information is to be provided in the Mission Capability Volume**." (emphasis in original).  Offerors, however, were instructed to discuss other items in the mission capability proposal, as follows:

Offerors shall describe recent similar experience at the corporate and service delivery level in demonstrating value relative to MNS/NCAS and in working with customer organizations to understand and meet their needs. The proposal will describe comparable experiences in providing the types of services applicable to MNS/NCAS to include the contract number, site,

period of performance and size of effort.  The contracts identified shall demonstrate the organization's performance or responsibility for performance of services similar to those described in the SOO [Statement of Objectives]. Demonstration of experience in the ability to control cost and schedule, and to identify problems or potential problems in a timely manner in the performance of the contract/task.  At a minimum, the proposal will identify the technical approach, overall capability of the proposed team, risk assessment of the representative tasks, ANG Support tasks proposed for the technical solution, compliance with DoD IA [Department of Defense Information Analysis] standards, overall business approach, relevant management experience (including Mass Notification System/Net-Centric Alerting System) and identify the extent to which the management experience relates to the current requirement.  Offerors will provide clear, definitive and verifiable examples in which it has voluntarily adjusted or proposed and implemented novel solution arrangements in order to better meet effort/requirements and create efficiencies in the previous three (3) years.

The Solicitation left open the option for the Air National Guard to negotiate with the offerors, stating that "[i]f the Government enters into discussions, it will be with those Offerors considered to be within the Competitive Range."

In a May 1, 2012 memorandum, an "Independent Government Cost Estimate" was provided for a "NetCentric Alert System," with the base year cost for contract performance estimated at [redacted].[8]  The base year cost was composed of the following: one "Net Centric Alert Client Package," for [redacted]; "Enterprise CAP Server Software Licenses," for [redacted]; "Annual Software Assurance & Technical Support," for [redacted]; and two "CAP Server[s]," for [redacted].  The government also estimated the cost of "Annual Software Assurance & Technical Support" for the 2014 option year to be [redacted].  The government did not estimate a cost of "Annual Software Assurance & Technical Support" for the 2015 option year.

---

[8]  It does not appear from the record before the court that another Independent Government Cost Estimate was issued after the Air National Guard cancelled the previous solicitation on November 7, 2012, or before the Air National Guard issued Solicitation currently under review on February 21, 2013.  There is, however, an undated document in the record, signed by Mr. Holmes and Mr. Wilson, titled "**PRICE REASONABLENESS DETERMINATION**." (emphasis and capitalization in original). The one-page determination lists the total RGS, [redacted], and FCN proposed prices for the Solicitation, for the base year cost of contract performance, plus option years, as well as a price for an "**IGCE** [independent government cost estimate]." (emphasis and capitalization in original). According to the undated document, the independent government cost estimate was listed as [redacted], to cover both the base year and both option years.  This figure is different, however, from the May 1, 2012 independent cost estimate, discussed above, of [redacted] for the base year and [redacted] for only one option year.

The FCN Proposal

        FCN's mission capability proposal, volume one of the protestor's proposal, centered on the use of the Desktop Alert software version 5.x, provided by subcontractor Desktop Alert.[9]  According to FCN's mission capability proposal,

        Desktop Alert Software version 5.x can centrally track, in real-time, all alerting activities for individual recipients, including alerts sent, received, and responded to, and generate reports based on this tracked information. The Desktop Alert Software version 5.x, with our proposed implementation plan, meets all ANG MNS NCAS objectives.

FCN's mission capability proposal continued, "[e]ach Desktop Alert Software version 5.x instance meets or exceeds the Air National Guard's (ANG) Mass Notification Systems (MNS) Net-Centric Alerting System (NCAS) requirements."  FCN proposed to upgrade the current Air National Guard Desktop Alert software to version 5.x, and train appropriate personnel on use of the software package.  FCN noted: "The [redacted] Air National Guard Wings currently use [redacted] servers for their existing Desktop Alert (DTA) Mass Notification System (MNS). . . .  [redacted] of the Air National Guard personnel are currently supported by this existing installed and operational Desktop Alert Mass Notification System."

        Regarding hardware, FCN's mission capability proposal stated that FCN would provide "[redacted] servers," "located in [redacted] different secure, [redacted] facilities," "backed up by [redacted] dedicated lines capable of delivering a daily volume of [redacted] calls."  FCN's mission capability proposal did not specify how or from where this telephony capability was to be provided.[10]  In its mission capability proposal FCN also stated that the same [redacted] capabilities mentioned were "assumptions . . . regarding the Air National Guard's [redacted] system."  FCN's price proposal included a charge of [redacted] per-contract-year to cover "[redacted] dedicated lines capable of delivering a daily volume of [redacted] calls."

        FCN, in its mission capability proposal, indicated potential cost savings, stating that use of Desktop Alert "leverages the investment made to-date by the ANG," and "[m]aximize[s] ANG resource investments to date by leveraging the in place Desktop Alert NCAS, infrastructure, interfaces, and training."  FCN further indicated in its mission capability proposal that its centrally hosted, high-scalability approach, "represents substantial savings over the traditional deployment model," and would "support at a

_____

[9] The parties have stipulated that FCN is an authorized reseller of Desktop Alert software.

[10] At a hearing before the court, however, FCN stated that its telephony capability utilized a "[redacted] system," and, therefore, did not need to rely on [redacted] lines, indicating that this was "[o]ne reason that their [redacted] system costs much less than RGS's."

lower cost than the traditional model," "without incurring additional deployment or operation configuration costs."   FCN also stated that this approach would "incur no additional configuration costs."

In FCN's price proposal, volume four of its proposal, FCN again highlighted the Air National Guard's prior use of Desktop Alert, stating that the "Desktop Alert mass notification software has been in daily use by the [redacted] Air National Guard Wings for several years."   Below is a summary of FCN's base year pricing structure, as reflected in its price proposal:

| Item # | QTY | Catalog # | Description | Unit Price | Extended Price[11] |
|---|---|---|---|---|---|
| 1 | [redacted] | [redacted] | Desktop Alert Software version 5.x Annual Software Assurance and Technical Support Enterprise 25K User | [redacted] | [redacted] |
| 2 | [redacted] | [redacted] | Desktop Alert - Phone/SMS Alerts - [redacted]  Combined [redacted]  and or [redacted] Voice Message/SMS Delivery ([redacted] exchanges, [redacted] per call, Call Minutes valid for [redacted] from contract date)[12] | [redacted] | [redacted] |
| 3 | [redacted] | [redacted] | Upgrade to Desktop Alert Software version 5.x Server Software Enterprise License Maximum 25000 Users | [redacted] | [redacted] |
| 4 | [redacted] | [redacted] | A plan detailing the process of coordinating the distribution of patches, upgrades and hot fixes to the server and client systems. | [redacted][13] | [redacted] |
| 5 | [redacted] | [redacted] | A Training Plan to provide training to the ANG Users and Administrators. | [redacted] | [redacted] |

[11] Extended Price was equivalent to Unit Price times quantity.

[12] FCN estimated in its price proposal that the Air National Guard would require capacity for "[redacted]  Alerts."   FCN stated in its price proposal that "[i]n previous solicitations the ANG estimated the annual call volume to be a maximum of [redacted]  calls," and that the addition of [redacted] could raise this number.

[13] The price given for the two training plans differed throughout FCN's price proposal between [redacted] and [redacted].   The latter value was used in both the final price summary and detailed breakdown charts.

| 6 | [redacted] | [redacted] | Desktop Alert Software version 5.x Onsite Engineering Support (1 Day) | [redacted] | $ [sic] [redacted] |
|---|---|---|---|---|---|
| 7 | [redacted] | [redacted] | Desktop Alert Software version 5.x Onsite Training [redacted] | [redacted] | [redacted] |
| 8 | [redacted] | [redacted] | Desktop Alert Software version 5.x [redacted]  Engineering Support (1 Day) | [redacted] | [redacted] |
| | | | | | |
| | | | SUBTOTAL | [redacted] | |
| | | | Discount [redacted] | | |
| | | | **BASE YEAR FIRM FIXED PRICE AMOUNT** | [redacted] | |
| | | | | | |
| 9 | | | Reimbursable Travel Estimate | [redacted] | [redacted] |
| | | | | | |

(capitalization and emphasis in original).  As stipulated to by the parties, "FCN did not include a charge in its price volume for the approximately 100,000 Desktop Alert licenses the ANG had already purchased through contract W9133L-09-F-0139," a different, prior contract.[14]  Instead, as reflected in Item 0001 in the above pricing chart, FCN intended to charge for: (a) "Upgrad[ing] the currently installed [redacted] Wings to Desktop Alert v5.x," (b) "Annual software support to include patches and updates," (c) "Remote phone, email, webinar support services," and (d) "Initial administrator training." Along with the [redacted] new Desktop Alert enterprise licenses provided (Item 0003), the FCN proposal was capable of supporting [redacted] users.  Finally, a [redacted] percent blanket discount was applied to all prices, not including travel costs, to arrive at a base proposal price of [redacted].  The price was listed as a "**FIRM FIXED PRICE AMOUNT**." (emphasis and capitalization in original).  The two option years were priced identically for [redacted], as follows:

| Item # | QTY | Catalog # | Description | Unit Price | Extended Price |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | Desktop Alert Software version 5.x Annual Software Assurance and Technical Support Enterprise [redacted] User | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | Desktop Alert - Phone/SMS Alerts - [redacted]  Combined Calls and or [redacted] | [redacted] | [redacted] |

---

[14] FCN's price proposal estimated the Air National Guard "Installed Base," or those users for whom prior versions of Desktop Alert already had been installed, to be [redacted] personnel.

| | | | Voice Message/SMS Delivery (US based exchanges, Maximum 1 minute per call, Call Minutes valid for 18 months from contract date) | | |
|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | Desktop Alert Software version 5.x 4 hour online training webinar | [redacted] | [redacted] |
| | | | | | |
| | | | SUBTOTAL | [redacted] | |
| | | | Discount [redacted] | | |
| | | **OPTION YEAR 1  FIRM FIXED PRICE AMOUNT** | | [redacted] | |

(emphasis in original).  After a [redacted] discount was applied,[15] the option year price for [redacted] was proposed as [redacted].  The price was listed as a "**FIRM FIXED PRICE AMOUNT**." (emphasis and capitalization in original).[16]

The RGS Proposal

    RGS explained in its mission capability proposal that it "has partnered with Company A[17] to deliver the solution for ANG that answers and/or exceeds 100% of the requirements of the RFP."  RGS described AtHoc's prior work with the United States Air Force, claiming that "virtually all AF personnel (less ANG) depend on Company A's technology for emergency alerts and accountability."  RGS claimed that "Company A's deployment across the USAF already covers [redacted] military, civilian and contractor personnel stationed at over [redacted] USAF facilities worldwide."  RGS also stated in its mission capability proposal that [redacted] different United States Air Force MAJCOMs [Major Commands] adopted AtHoc technology for their Mass Notification Systems, and RGS listed the commands in its proposal.  RGS further stated in its mission capability proposal that AtHoc would provide its Mass Notification System software product, IWSAlerts.[18]

---

[15] No reason was given by FCN for why a [redacted] discount was applied to the base performance costs and a [redacted] discount was applied to the option years.

[16] The past performance proposals and small business participation proposals, volumes two and three of the overall proposals, were not included in the record before the court for any of the offerors, and were not put into issue in the current protest before the court.

[17] In its proposal, RGS did not mention its subcontractor AtHoc by name, and instead referred to AtHoc as "Company A."

[18] As stipulated to by the parties, RGS is an authorized reseller of AtHoc IWSAlerts.  As further stipulated to by the parties, FCN is not an authorized reseller of IWSAlerts, nor is RGS an authorized reseller of Desktop Alert.

RGS emphasized in its mission capability proposal that, by working with RGS and AtHoc, the Air National Guard could leverage a number of synergies through AtHoc's prior work with the United States Air Force.  In particular, RGS stated that the Air National Guard could "**[l]everage existing Company A licenses owned by USAF** - The USAF already purchased sufficient Company A licenses to cover [redacted] personnel, including [redacted]. . . .   This translates to no cost for ANG for these licenses, given that the licenses have already been paid for by USAF." (emphasis and capitalization in original).  According to RGS, the Air National Guard additionally could:

> **Leverage existing USAF Telephony Alerting capability** - The USAF established in 2011 the AF Enterprise Telephone Alerting capability, which reduces annual cost by [redacted] and increases operational capability across the entire AF, all using Company A technology.  The capability allocates over [redacted] lines to USAF units for the purpose of alerting, enabling every AF unit to make over [redacted] emergency calls per minute . . . .   This proposal will leverage this pool to provide ANG access to this massive AF Enterprise capability at a fraction of the cost it would take ANG to develop it on its own.

(emphasis in original).  RGS explained that this capability meant that a "[redacted]." Additionally in its mission capability proposal, RGS stated that "[t]he AF Enterprise TAS [Telephony Alerting System] capability was successfully 'surge tested' in Oct 12 when four MAJCOMs simultaneously initiated an after duty hours personnel recall check; Company A functioned as designed and passed with flying colors, successfully reaching over [redacted] users per hour by phone."  RGS also indicated:

> Once ANG joins all other MAJCOMs in using Company A, ALL ANG units will have access to the existing AF Enterprise Telephone Alerting capability; over [redacted] reserved alerting telephone lines activated simultaneously, with firm fixed price for unlimited telephone and text message alerts.

According to RGS, the telephone capability was provided through a hosted service, "a commmunication [sic] capability from multi-redundant and secure commercial data centers." The RGS mission capability proposal stated that "[t]he [redacted] communication services [redacted]."  RGS did not mention in its mission capability proposal that [redacted]  extra telephone lines would be added to the [redacted] telephone lines allegedly available from the United States Air Force capability, to bring the total resource to [redacted] lines. This fact is reflected in RGS' price proposal, discussed more fully below.

In its mission capability proposal, RGS further claimed that the Air National Guard could leverage United States Air Force, [redacted], "**pre-negotiated FFP [Firm Fixed Price] rates for telephony and SMS [Short Message Services] calls**," as well as "**existing Company A Computer Based Training built for USAF**," pre-created

web-based training programs, and pre-planned scenarios.  (emphasis in original).  RGS also stated that, because of AtHoc's prior installations with the "US Air Force, US Navy, US Coast Guard, US Army, US Marine Corps, and numerous federal agencies," the Air National Guard, using AtHoc software, "could notify not only all ANG units affected, but cascade across to other services and organizations in the area."  RGS further claimed in its mission capability proposal that AtHoc could allocate accounts and change who had access to the service virtually, as follows:

> Unlike other product, [sic] Company A's software is [redacted].   This means that there is [redacted].

(capitalization in original).  As stipulated to by the parties, "[t]he RGS Mission Capability volume did not state how many IWSAlerts licenses the Air Force currently held, merely that the Air Force had purchased enough to cover all Air Force and ANG personnel." Furthermore, according to the parties, "[t]he RGS proposal did not specify how many licenses the Air Force was using, and the proposal did not provide proof that the Air Force committed to transfer the licenses to the ANG, or allow the ANG to use the licenses, permanently, temporarily or under any other conditions."

The RGS mission capability proposal also discussed cost savings.   In the executive summary, RGS stated that their solution "provides innovative and cost-efficient solutions to the outlined needs."  RGS also claimed to be

> acutely aware of the budget pressures the DoD currently faces and is proactive about identifying multiple ways to reduce costs and increase efficiencies within the NCAS/EMNS [Emergency Mass Notification System] programs.  As such this proposal will leverage existing USAF resources/capabilities to achieve program objectives in a highly cost efficient manner, as requested by the RFP in Section C.4.B.

Additionally, RGS stated that it would "[redacted]," negotiated previously with the Air Force when RGS installed the Air Force's Mass Notification System.  RGS claimed that the software licenses would be at "no cost for ANG," and that the Air National Guard could take advantage of the United States Air Force telephone capacity at a "fraction" of the cost of building one themselves.  RGS also claimed that it could offer "web-based training sessions for all ANG personnel [redacted] at no additional cost."   RGS concluded the executive summary of its mission capability proposal by stating that its offer "results in significant efficiencies and cost savings while it maintains and improves on the powerful EMNS capability the USAF already owns."  RGS consistently claimed in its mission capability proposal that its processes were "low total-cost-of-ownership," "cost-efficient," cost-effective, or similar, that the use of the [redacted] telephone lines from the Air Force Enterprise Telephone Alerting Capability would be extended to the Air National Guard "at no additional cost," and that its proposal allowed for [redacted] telephone text message alerts at a Firm Fixed Price.   At no point in RGS' mission capability proposal was a dollar figure mentioned for the overall proposal or for any of the no-cost components.

RGS' pricing structure for the base year and option years, as reflected in its price proposal was, as follows:

[chart redacted]

In its price proposal, RGS discounted [redacted] of its product license costs, and the costs related to access to the [redacted] telephone lines.  RGS proposed an annual fee of [redacted], discounted [redacted] from the list price of [redacted], to add another [redacted] telephone lines to the overall telephone line bank.  As a result, although the proposed list price for materials was [redacted], it was discounted [redacted],[19] for a final price of [redacted], a discount of [redacted].  As a result, the base year cost for contract performance for RGS' proposal came to [redacted].  In the notes below the pricing chart, in its proposal, RGS tried to explain its [redacted] discount of the software product licenses, as well as the [redacted] telephone lines to be shared with the United States Air Force.  RGS stated:

> The USAF procured sufficient perpetual "Company A" Enterprise Server and COR [Contracting Officer's Representative] User Client Access Licenses (CAL) Product Licenses to support all personnel.  "Company A" agreed to the following terms from DITCO/BOA [Defense Information Technology Contracting Organization/Basic Order Agreement] Contract [redacted], 9 Aug 11:
>
> *"AF shall be entitled to operate the software on any platform the software Vendor supports and transfer the software or maintenance between platforms.  There shall be no additional charge for transferring software from site-to-site or machine-to-machine where AF maintains AF Service responsibilities as long as the scope of license is materially similar. There shall be no additional cost transferring maintenance from site-to-site or machine-to-machine where AF maintains AF Service responsibilities as long as the maintenance requirements and scope of service are materially similar (e.g., number of data centers, sites, operators or end-users supported)."*
>
> Because existing USAF IWSAlerts licenses are available as GFE, they will be reallocated and distributed for ANG use.  This significantly reduces the cost of implementing an ANG Enterprise solution because the software costs would typically be by far the most expensive portion of this contract- here they are simply GFE.  This proposal pricing includes the necessary licenses as GFE.  As a frame of reference, both PACAF and AMC enjoyed the same benefit as ANG does in this proposal, with their recent deployment of "Company A."

---

[19] RGS' price proposal put the discount value for materials in the proposal at [redacted].

. . .

> Instead of having to lease additional dedicated alerting communications lines for ANG unit use, ANG can leverage the operational USAF Enterprise Telephone Alerting capability, with Firm Fixed Price Telephony and SMS calls, significantly reducing annual Communications Services. This proposal pricing utilizes this capability.

(emphasis in original).  RGS also explained that it could offer a low-cost training solution because "[e]xisting USAF Computer Based Training and bi-weekly live online training sessions will be offered to all ANG operators, simply by registering."[20]

Evaluation of the Proposals

The Air National Guard Source Selection Evaluation Board met to review proposals on March 25–29, 2013.  According to the Source Selection Evaluation Board's Technical Evaluation Summary, seven offerors responded to the Solicitation: RGS, [redacted], FCN, [redacted], [redacted], [redacted], and [redacted].  When conducting the technical evaluation, the Source Selection Evaluation Board stated in its Technical Evaluation Summary:

> The Cost/Pricing nor Small Business Commitment evaluations were not within the scope of this team's tasks except to determine the reasonableness of the cost in relation to the technical merits of the proposal.  Otherwise, Cost/Pricing will be evaluated by the contracting officer when determining the best value to the Government.

Later in the Technical Evaluation Summary, however, the Source Selection Evaluation Board stated that "[o]ur assessments were based strictly on mission capability, performance history and cost."  The Source Selection Evaluation Board rated the offerors on two of the four evaluation factors, Mission Capability and Past Performance, which are summarized below:

_____

[20] [Redacted], which also submitted a proposal pursuant to the Solicitation, and was ranked second to RGS, stated in its mission capability proposal that it similarly proposed to partner with AtHoc, and discussed AtHoc's prior success with the Air Force.  Although the parties did not provide [redacted's] price proposal in the record before the court, an examination of the mission capability proposal indicates that [redacted] also appears to have proposed sharing AtHoc's prior licenses with the United States Air Force with the Air National Guard, at no cost.  It is not clear from the [redacted] mission capability proposal whether the telephony capability it offered is the same as what was offered by RGS, although such may be the case.  The Source Selection Evaluation Board commented that "[t]he [redacted] and RGS offers were practically the same due to their choice in sub-contractor."  [Redacted] also discussed cost savings within its mission capability proposal, stating, for example, that it "achieves 100% compliance with the SOO [Statement of Objectives] yet with low total-cost-of-ownership."

| Offeror | Mission Capability Rating[21] | Past Performance Rating[22] |
|---|---|---|
| RGS | Outstanding | Substantial Confidence |
| [redacted] | Outstanding | Substantial Confidence |
| FCN | Outstanding | Substantial Confidence |
| [redacted] | Unacceptable | Limited Confidence |
| [redacted] | Unacceptable | Limited Confidence |
| [redacted] | Unacceptable | Limited Confidence |
| [redacted] | Unacceptable | Limited Confidence[23] |

The Technical Evaluation Summary stated that FCN's proposal "provides detailed information of planned execution as well as the use of assets presently in place."

The Technical Evaluation Summary also commented on RGS' "multiple client installation methods and the cost savings for utilizing existing GFE," as well as that the RGS proposal provided "an enterprise solution reducing the ANG total cost of ownership." The Technical Evaluation Summary also listed, as a strength of the RGS proposal, that "[t]he vendor's past experience demonstrates their understanding of the ANGEN [Air National Guard Enterprise Network] and shows they are capable of performing on an effort as to the scope and magnitude of the solicited requirement." [Redacted's] proposal received the same positive comments as the RGS proposal. The executive summary at the end of the Technical Evaluation Summary stated the following:

> The 3 offerors that met the objectives were FCN (AQR0015-02), RGS Federal Incorporated (AQR0015-04), and [redacted] (AQR0015-13). Though the 3 vendors were all rated Outstanding, there were subtle differences that separated them from one another. The [redacted] and RGS offers were practically the same due to their choice in sub-contractor

---

[21] According to the Technical Evaluation Summary, "the Mission Capable [sic] Factor evaluation provides an assessment of recent similar experience at the corporate and service delivery level in demonstrating value relative to Mass Notification System (MNS)/NCAS and in working with customer organizations to understand and meet their needs."

[22] According to the Technical Evaluation Summary, "[t]he Past Performance evaluation assesses the degree of confidence the Government has in an Offeror's ability to supply products and services that meet users' needs, including cost and schedule, based on a demonstrated record of performance."

[23] Although no confidence was marked in the Technical Evaluation Summary for the [redacted] proposal, the Technical Evaluation Summary stated in the text that the Source Selection Evaluation Board had "limited" confidence in the [redacted] proposal.

> [sic] (AT-HOC) was [sic] supplying the end solution. . . .  FCN was equally
> impressive, and offerered [sic] a very relevant Past Performance history.
> The SSEB [Source Selection Evaluation Board] finds the aforementioned
> proposal to be equal and the government would be well served if [sic]
> regardless of which Offeror is [sic] wins the award.

The Source Selection Evaluation Board recommended the top three offerors, in the
following order: RGS ("Best Value"), [redacted] ("Acceptable/Capable"), and FCN
("Acceptable/Capable").

The parties stipulated that "[d]uring the SSEB's discussions, SSEB members
expressed concerns about potential software licensing issues." Therefore, on April 2,
2013, the Source Selection Evaluation Board submitted a written questionnaire to the
three offerors in the competitive range, FCN, RGS, and [redacted].  The April 2, 2013
questionnaire instructed the offerors to provide responses "within two (2) hours of
receipt of this email."   The April 2, 2013 questionnaire posed the following three
requests:

> Request the Vendor confirm that (1) the number of licenses provided in
> their proposal covers the total ANG population (currently estimated at
> 108,436) at all times, (2) If costs are figured with the idea that licensing is
> covered by GFE; will the vendor provide in writing and signed by the
> appropriate government official proof of such claim, and (3) will the vendor
> assume ALL RISKS with licensing issues related to this effort; meaning
> the ANG will not be charged/billed in any way for additional licensing
> throughout the life (POP [Period of Performance]) of this contract; to
> include Base plus any Option Years beyond the cost/price proposal
> submitted in response to this solicitation.

(capitalization in original).

All three offerors in the competitive range responded to the April 2, 2013
questionnaire. FCN responded to the first question, stating in relevant part, "[o]ur
response to this W9133L-13-R-0015 proposal provides a total Desktop Alert Software
v5.x perpetual enterprise software license to cover a maximum of [redacted] ANG end
users." FCN responded to the second question by stating, in part, that FCN's proposal
"includes the Desktop Alert Software v5.x perpetual licenses sufficient to cover the total
ANG population (currently estimated at 108,436) at all times," and indicated that the
"VMWare vSphere Server/Client 4.1 software, Windows Server Licenses, and SQL
Database Licenses are provided by ANG and considered GFE."  FCN responded to the
third question by stating, in part, that FCN "will assume all risk regarding licensing
Desktop Alert Software v5.x throughout the life (POP) of this W9133L-13-R-0015
contract; including Base plus any Option Years beyond the cost/price proposal
submitted in response to this W9133L-13-R-0015 solicitation."

RGS responded to the first question by stating:

> After consulting with our partner AtHoc, we confirm that the number of licenses in our proposal covers the total ANG population (currently estimated at 108,436 but may grow or fluctuate moderately) at all times. . . .  AtHoc, as the developer of IWSAlerts software has legal authority to grant licenses for any AtHoc customer, including USAF.

RGS responded to the second question by stating:

> We did reconfirm with Mr[.] Jim Rau, AF MSN [Air Force Mass Notification System] PMO [Project Management Office] again this morning that, Yes we will provide in writing and signed/approved by PMO that sufficient USAF owned licenses exist, and they will be reallocated to support ANG at no additional charge.  Because of the very tight 2 hour suspense, Mr[.] Rau will confirm by separate email.

The parties have stipulated that the Source Selection Evaluation Board did not receive the e-mail from Mr. Rau of the Air Force Mass Notification System Project Management Office within the two hours from receipt of the April 2, 2013 questionnaire as was required for responses.  It was not until June 5, 2013, more than two months after the deadline to respond to the April 2, 2013 questionnaire, and almost two months after the award was made, that Mr. Rau wrote an e-mail to Mr. Holmes, titled "AtHoc Product Licensing."  Mr. Rau indicated that he was from the United States Air Force Program Executive Office and stated that when the United States Air Force was developing its own mass notification system

> AtHoc revealed to us that the Air Force has purchase [sic] sufficient licenses thru numerous procurements to cover the total Air Force Need. Accordingly, the AFMC's [Air Force Materiel Command's] renewal incorporated an [sic] change in the licensing agreement to allow the use of the AFMC licenses anywhere within the Air Force thus making available sufficient licenses for [redacted].

Mr. Rau also stated that, with regards to a different RFI related to the United States Air Force mass notification system, "AtHoc's response to our RFI again stated that the AF owns sufficient licenses to cover the [redacted]."  Mr. Rau also admitted, however, that "this office has no contract with AtHoc or any of their resellers."

RGS responded to the third question in the April 2, 2013 questionnaire by stating:

> RGS will assume ALL RISK with licensing issues related to this contract effort, and the ANG will NOT be charged/billed in any way for additional licensing throughout the life (POP) of this contract, including Base plus

any Option Years beyond the cost/price proposal submitted in response to this solicitation.  The only costs anticipated for ANG will be the annual sustainment costs as proposed in our offering.

(capitalization in original).

RGS also attached a copy of a 2011 contract between Defense Information Services Agency – Defense Information Technology Contracting Organization, and an AtHoc reseller, [redacted] contract [redacted].  It contained as part of "<u>ADDITIONAL TERMS & CONDITIONS</u>" (emphasis and capitalization in original), the following:

1. AF [Air Force] shall be entitled to operate the software on any platform the software Vendor supports and transfer the software or maintenance between platforms.  There shall be no additional charge for transferring software from site-to-site or machine-to-machine where AF maintains AF Service responsibilities as long as the scope of license is materially similar.  There shall be no additional cost transferring maintenance from site-to-site or machine-to-machine where AF maintains AF Service responsibilities as long as the maintenance requirements and scope of service are materially similar (e.g., number of data centers, sites, operators or end-users supported).

2. Should there be a restructuring of AF or its mission during the life of the contract, the contractor agrees that AF's software licenses, capacity levels, usage rights, entitlements and contracts shall transfer to the successor DoD organization(s) to which AF may transfer its responsibilities for computing services for the AF.

RGS further stated in its response that, "[t]his same contract enabled [redacted], [redacted], [redacted], and [redacted] units to likewise use reallocated AtHoc licenses for similar contract efforts."

The parties to this litigation also stipulated:

The contract RGS provided is not enterprise-wide across all the Air Force, but is restricted to one command.  The contract does not state the number of licenses provided, does not indicate that the Air Force would be receiving extra or surplus licenses that could later be transferred, and does not indicate that the Air Force would be willing to give up any or all the licenses provided under that contract.

(internal citation omitted).[24]  Additionally, the parties stipulated that the contract, which

---

[24] [Redacted's] response to the questionnaire contained the exact same statements as the response submitted by RGS, except using [redacted's] name in place of RGS, and [redacted] attached the same sample contract to its response.

was cited in RGS' response to the April 2, 2013 questionnaire, the 2011 contract between Defense Information Services Agency – Defense Information Technology Contracting Organization, and an AtHoc reseller, [redacted], contract [redacted], did not contain RGS or AtHoc as a party; the contract, instead, was between "DISA-DITCO [Defense Information Services Agency – Defense Information Technology Contracting Organization], on behalf of the Air Force, and [redacted], an AtHoc reseller." Moreover, the 2011 [redacted] contract does not provide access to the same [redacted] lines RGS offered the Air National Guard in the Solicitation at issue, but includes as equipment, "[redacted]," with a quantity of [redacted] lines.

On behalf of RGS, Andy Anderson, Vice President for Business Development, Defense & International for AtHoc, forwarded to a Willie Holmes, who was not part of the Source Selection Evaluation Board, but was the contract specialist and the point of contact for the submission of offers to the agency, an e-mail from John Bartoli, "a civilian employee of the Air Force Materiel Command." The parties stipulated that "RGS had asked Mr. Bartoli to confirm that the Air Force could make available licenses for IWSAlerts to the ANG under the terms of Contract [redacted] that the Defense Information Services Agency - Defense Information Technology Contracting Organization (DISA-DITCO) awarded to [redacted]." The e-mail from Mr. Bartoli to Mr. Holmes was time-stamped April 2, 2013, at 9:23 p.m., and stated in full:[25]

> I can verify this is the AFMCcontract [sic] for AtHoc sustainment; that it does include the referenced verbiage for no cost transfer of licenses; that we did exercise this right; and that the transfers were made available for reuse by the AF Program Management Office.
>
> I need to also state that AFMC is no longer paying sustainment for transferred licenses, and that this cost liability still exists if the AF wants to continue using the licenses.

On the same day, April 2, 2013, the Source Selection Evaluation Board stated that it had reached a consensus that "[a]ll Offerors response [sic] confirmed their

---

[25] It is unclear if the Source Selection Board reviewed Mr. Bartoli's e-mail before coming to its selection, or if the Bartoli e-mail reached Mr. Holmes within two hours of the submission of the April 2, 2013 questionnaire. During the FCN protest at the GAO, a June 28, 2013 e-mail from the National Guard Bureau, sent in response to a FCN document request during the GAO proceedings, stated: "There was no 'correspondence between the AF and ANG concerning confirmation of the availability of licenses, conducted during the evaluation of proposals under this procurement.'" The Air National Guard, however, later tried to recant that statement, claiming in a later statement to the GAO that the prior statement resulted from a miscommunication. In a second statement, Mr. Wilson declared, under penalty of perjury, that he "read the string containing Mr. Bartoli's e-mail prior to making my source selection decision . . . . In my view, then and now, the e-mail string supports RGS's express affirmation that they would provide licenses as GFE in line with their proposal."

original claim, stating in writing that there's 'NO RISK' to the ANG in terms of licensing which was the concern of the SSEB, and the reason for the reconvening of the SSEB." (capitalization in original).  Therefore, the Source Selection Evaluation Board made no changes to its evaluation of the offerors.

The final award decision was made by Air National Guard contracting officer Mr. Wilson, who was also the source selection official.  His decision was reflected in the April 17, 2013 "**SOURCE SELECTION DECISION DOCUMENT**." (capitalization and emphasis in original).  The source selection decision document indicated that Mr. Wilson had reviewed the proposals, the Technical Evaluation Summary, and had made a final decision regarding which offeror should be awarded the contract.

Regarding the first two factors, mission capability and past performance, Mr. Wilson stated that he had conducted his own "in-depth" review of the proposals, but no record of his independent technical investigation has been offered to the court.  Instead, the Technical Evaluation Summary was adopted fully into the source selection decision document without any changes or objections.  Mr. Wilson also stated in the source selection decision document, "I concur with the ratings provided by the SSEB in their report to this office dated 12 April 2013."

With respect to the third evaluation factor, "Small Business Participation," Mr. Wilson evaluated all offerors, but [redacted] as "outstanding."  Regarding the fourth evaluation factor, price, Mr. Wilson found that "[redacted] had incomplete pricing, [redacted] and the remaining five were found to be reasonable . . . ."[26]  Mr. Wilson stated, "I found that five of the six price proposals that included options to be realistic. Realism was evaluated in terms of the price proposed was [sic] found appropriate to the technical solutions offered."  Mr. Wilson indicated the following price structure for FCN, RGS, and [redacted], as summarized below:

| Offeror | Base Year Cost | Option Year 1 | Option Year 2 | TOTAL |
|---------|----------------|---------------|---------------|-------|
| RGS | [redacted] | [redacted] | [redacted] | $1,316,357.58 |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| FCN | [redacted] | [redacted] | [redacted] | [redacted] |

In his source selection decision document Mr. Wilson stated that, under the price factor analysis, the three offerors, FCN, RGS, and [redacted], were found to have "complete, accurate, reasonable and realistic" prices.  Mr. Wilson stated that "[t]he reasonableness of the offers was evaluated by reviewing the proposed prices, against the potential for

---

[26] Mr. Wilson, noted, however, on the same page of his source selection decision document that "[f]ive of the proposals were found to be complete.  I note that one proposal from [redacted] did not include prices for the option years, which was not responsive to the requirements of the solicitation.  Another had incomplete pricing, [redacted] due to the lack of pricing for a service provider to track and text data (required by the SOO)."

buy-in and any unbalances." The undated price reasonableness determination, concluded, without further explanation, that the RGS price proposal "is considered fair and reasonable."

In making his final decision, Mr. Wilson discussed whether a "Tradeoff Analysis," was warranted between FCN, RGS, and [redacted].  He concluded:

> Since the Following [sic] three vendors, RGS Federal, Inc. [sic] [redacted], and FCN received Outstanding Mission Capability ratings along with Substantial Past Performance and Outstanding Small Business Commitment, a trade off was not needed as such RGS Federal, Inc. received the award because their cost was the lowest.   Again, I understand that adjectival ratings are merely guides to intelligent decision making.   In this case, however, these three acceptable proposals were truly equal in my view in terms of their non-price factor ratings.

Mr. Wilson ended the source selection decision document by stating: "Since RGS Federal, Inc. had the lower overall price for all three years, award was made to RGS Federal, Inc."  The contract, W9133L-13-P-0034, was issued by "NGB-AQ-AF JOINT BASE ANDREWS," to RGS on April 22, 2013, and signed by RGS on April 23, 2013. (capitalization in original).  The Notice of Award to RGS indicated that the total award amount was $1,316,357.58, representing the price for the base year and two option years.

<u>Post Selection History</u>

FCN requested a debriefing following the award to RGS.  The National Guard Bureau responded by sending a debriefing letter to FCN, dated May 6, 2013, and signed by Mr. Wilson.  The letter stated that "[t]he government found no significant weaknesses or deficiencies as that term is used in the FAR," and that "[y]our proposal was ranked third of the seven.  RGS, obviously, was ranked first," and [redacted] second.  In providing a summary for the rationale for the award, Mr. Wilson stated:

> As stated in the solicitation, the Government sought to award this contract deemed to provide the *best value* to the Government.  As reflected in the adjectival ratings, the Government found that your company submitted an outstanding proposal for this contract.  The Government evaluators and I also found your past performance to merit the highest rating in this competition.  The awardee's proposal was found to be equal to yours in terms of technical and past performance rating. As such, the main discriminator became the significantly lower price offered by the [sic] RGS. I recognize that price was the least important factor in this competition, however, in light of the relative equivalence of your proposal and the awardee's proposal, the significantly lower price submitted by RGS tipped the scales clearly in their favor.

(emphasis in original).

After receiving a written debriefing, FCN filed a protest with the GAO on May 13, 2013, claiming that the Air National Guard had conducted an improper price evaluation of the RGS proposal.  Specifically, FCN claimed that the "ANG failed to evaluate the RGS/AtHoc proposal adequately," that the RGS price proposal was unrealistic, and, therefore, that RGS should have been awarded a lower technical score.  FCN alleged that the RGS "proposed price of $1,316,357.58 should have been found to be well below a realistic cost for this project and indicative of 'buying-in' to this contract." Additionally, FCN claimed that the United States Air Force communicated to the Air National Guard previously, regarding the "AtHoc/RGS claims of 'free licenses' that, in fact, these 'seats' do not exist and even if they did exist, there is no legal way to move these 'seats' to the this [sic] procurement."  At the GAO, FCN asked for an automatic stay of performance "pursuant to FAR § 33.104(c)."  RGS moved to dismiss the GAO protest under FAR § 21.5(f) (2013), claiming that the "NGB [National Guard Bureau] did not have to consider price realism at all" in a fixed price contract, and that "the RFP gives the agency the express discretion to rely on the fixed price, or not."  In addition, RGS asked for the stay of performance to be lifted, but, on June 17, 2013, in an e-mail to the parties, the GAO declined to dismiss the protest.

On June 24, 2013, the Air National Guard submitted its agency report to the GAO.  In its comments to the agency report, FCN raised three new protest grounds. FCN claimed that, "**[t]he AtHoc software produce** [sic] **is not on the Air Force approved product list**," and that, without this, RGS was ineligible for the Solicitation at issue.  (emphasis in original).  FCN also raised a claim against [redacted], stating that "**[redacted] was not eligible for Award.**"  (emphasis in original).  In support, FCN stated that the same issues regarding the RGS proposal would render the [redacted] proposal ineligible as well, since [redacted's] proposal relied on the same AtHoc software product.  FCN further asserted that "**RGS Violated Proposal Requirements by Including Pricing Information In its Mission Capability Proposal**," by claiming the licenses would be "no cost" and cost-saving, and that these statements should have resulted in RGS being penalized during the award process or removed from contention. (emphasis in original).

In a July 19, 2013 supplemental agency report, the Air National Guard argued: "AtHoc's IWSAlerts is on the DIACAP [Department of Defense Information Assurance Certification]-level Approved Product List, which applies to all DoD components and supersedes the Air Force list." Regarding [redacted], in its supplemental report the Air National Guard indicated that FCN's claim was moot:

> The Guard has not proposed to award the contract to the second-rated offeror, nor has it challenged FCN's standing, as the third-ranked offeror, to protest the award to RGS.  The reason is that the second-ranked offeror proposed the same software solution as did RGS.  Thus, if the GAO sustained FCN's protest or supplemental protest, the Guard would not make an award to the second-ranked offeror.

The Air National Guard also maintained that the RGS comments about cost and pricing in the mission capability proposal are "*de minimis* at worst.  The statements that FCN cites do not, in fact, contain 'substantive pricing information,' such as unit prices or rates, but merely describe RGS's overall pricing strategy."  On July 25, 2013, both FCN and RGS commented on the Air National Guard's supplemental agency report.  In FCN's comments, it dropped the first two of the new protest grounds it had raised, the claim that AtHoc's software was not on approved lists, and the claim against [redacted]. FCN, however, mentioned that "it is significant to note that the Agency does not challenge FCN's standing as an interested party.  They [sic] Agency recognizes that because the RGS and [redacted] both proposed the same AtHoc software utilizing the same or a similar GFE licensing strategy, if the FCS [sic] protest were sustained, [redacted] would no longer be in line for award."

Also on July 25, 2013, the contracting officer and source selection official, Mr. Wilson, submitted a "**CONTRACTING OFFICER'S STATEMENT IN RESPONSE TO PROTESTER'S COMMENTS AND NEW PROTEST GROUNDS**," (capitalization and emphasis in original), in which he stated:

> I recognize that the transferability issue was not 100% verified prior to my award decision; however, I believe that our agency's examination of this issue was reasonable.  This decision was aided by RGS's clarification response and the e-mail response that I reviewed from Mr. Bartoli – the Chief Technology Officer from the Air Force Materiel Command on or about April 2, 2013.[27]  RGS has contractually promised these licenses to the ANG regardless of whether or not they are able to transfer from the Air Force.  In the event that these licenses do not transfer, RGS would be required to provide them to the ANG or else they would face a cure notice and potential termination for default.

On August 19, 2013, the GAO denied FCN's protest.  The GAO stated that FCN's protest was "limited to the allegation that ANG failed to reasonably consider the cost realism of RGS' proposal as required by the terms of the RFP," as well as the allegation that "RGS ignored the RFP's instructions and improperly included cost information in its mission capability proposal."  The GAO noted in its decision that, "where the award of a fixed-price contract is contemplated, a proposal's price realism is not ordinarily considered." The GAO also stated that an agency may provide for a price realism analysis, "for such purposes as measuring an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance."  The GAO further noted that "[t]he nature and extent of an agency's price realism analysis are matters within the sound exercise of the agency's discretion."  The GAO found that the agency "specifically considered" the price realism issue, and that RGS' response to the Source

---

[27] As noted above, there is some doubt, and an apparent reversal of positions, as to when the Bartoli e-mail was received at the Air National Guard Contract Office and whether the evaluators and source selection officials reviewed it prior to contract award.

Selection Evaluation Board's April 2, 2013 questionnaire was sufficient:

> As noted above, the agency required offerors to confirm that they maintained sufficient licenses, provide proof of available licenses if proposing licenses as GFE, and assume all risk against the need for additional licenses for the life of the contract. RGS addressed all of these issues in its response.

The GAO further stated that: "On review of this record, we have no basis to conclude that the agency acted unreasonably in its evaluation of the realism of RGS' low price . . . ."  The GAO also briefly addressed FCN's second allegation in a footnote, stating that, "[t]he record shows that the cost information in RGS' mission capability proposal was limited to a description of RGS' approach of utilizing existing Air Force software licenses at no cost to the agency, consistent with the RFP direction to discuss 'technical approach' and 'business approach,' in the mission capability proposal." Additionally, the GAO commented that the RGS mission capability proposal was consistent with the RFP's provisions regarding "'[l]everaging existing resources/capabilities to achieve program objectives.'"  (modification in original).

Subsequently, FCN filed the above captioned bid protest in this court, alleging four protest grounds.  First, FCN claims that the Air National Guard failed to follow FAR Part 45 regarding the proposal and acceptance of government property or government-furnished property, alleging that "[d]uring the evaluation period of this RFP, the NGB Air Guard made no effort to eliminate in any way the competitive advantage that RGS and AtHoc held in proposing to use Government property," and that the Air National Guard failed to notify other offerors about potential use of the government-furnished property. Second, FCN claims that the Air National Guard contracting officer failed to conduct a reasonable price realism analysis, and argues that, "although the RFP promised a price realism consideration, the contemporaneous documents show that no such analysis occurred."  Third, FCN claims that RGS, through its statements referring to price in the mission capability proposal, violated the Solicitation's requirements and that the contracting officer failed to acknowledge or penalize RGS for this alleged violation. Fourth, FCN claims that RGS' knowledge of transferrable AtHoc licenses under a United States Air Force contract, which only those parties knew about, created "unequal access to information," and, therefore, a conflict of interest that the contracting officer had a duty to mitigate, but failed to do.[28]

In its complaint in this court, FCN asks the court to (1) declare that the Air National Guard evaluation of the proposals under the Solicitation unreasonable, arbitrary, and an abuse of discretion, (2) permanently enjoin the Air National Guard from continuing the contract with RGS, and (3) grant other such relief as the court deems appropriate.  In its motion for judgment on the administrative record, FCN also requests the court issue an order requiring the Air National Guard to "perform a re-evaluation of the existing proposals in accordance with the stated criteria and the applicable

---

[28] FCN subsequently withdrew the fourth protest ground concerning conflict of interest.

procurement regulations or, to the extent that its needs have not been properly explained by the existing RFP, order that the Agency amend the RFP to meet the Government's new requirements, and seek new final proposal revisions from the offerors considered to be in the competitive range."  With the agreement of the parties, this court consolidated FCN's request for preliminary injunction with its request for permanent injunction and declaratory relief, and the defendant agreed to stay performance until the court issued its decision.

## DISCUSSION

Standard of Review

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2013), which governs motions for judgment on the administrative record, the court's inquiry is directed to "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); see also DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (Supp. V 2011)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims.  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001).  The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision.  See, e.g., Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing to Scanwell Laboratories, Inc. v. Shaffer for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).  The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a

proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (2)(D) (2006);[29]

---

[29] The language of 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 1312 (Fed. Cir. 2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); Bannum, Inc. v. United States, 404 F.3d at 1351; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012).  "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also McVey Co. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law."  (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically has addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A).  See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of Title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5

---

(F) unwarranted by the facts to the extent that the facts are subject
    to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

U.S.C. § 706(2)(A) and citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform a meaningful review . . . ."), aff'd on subsequent appeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir.), and dismissed per stipulation sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995–96 (Fed. Cir. 1996); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999); C.A.C.I., Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983); Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004)).

Furthermore, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions.  See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.) ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."), reh'g en banc denied (Fed. Cir. 2013); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010).  Recognizing the two-step analysis of bid protest cases, the United States Court of Appeals for the Federal Circuit has stated that:

> A bid protest proceeds in two steps.  First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract.  Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351.  In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process.  See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."  Data General, 78 F.3d at 1562 (citation omitted).  Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error."  Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013) (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Const. Co., Inc. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). ""If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); see also HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery

Assistance v. United States, 101 Fed. Cl. 765, 780 (2011); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523 (2003).

As stated by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Com'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential.  This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir 2001).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion.  Burroughs Corp. v. United States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990).  Accordingly, agencies "are entrusted with

a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir), reh'g denied (Fed. Cir. 2002).

Similarly, the Federal Circuit further has indicated that:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 650 (2008) ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."), appeal dismissed, 356 F. App'x 390 (Fed. Cir. 2009); Textron, Inc. v. United States, 74 Fed. Cl. at 286 (in which the court considered technical ranking decisions as "'minutiae of the procurement process'" not to be second guessed by a court (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))). This is because "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also Unisys Corp. v. United States, 89 Fed. Cl. 126, 142 (2009) (holding that an agency's "exercise of such

technical judgment and expertise . . . . is entitled to the greatest possible deference under E.W. Bliss"); CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 717 (2011). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.   See WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'"   (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (internal citations omitted))).

The amount of discretion afforded the contracting officer is greater in some circumstances as compared to others.   For example, in a negotiated procurement, contracting officers are generally afforded greater decision making discretion, in comparison to their role in sealed bid procurements.   See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests."   (citations omitted)); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002) ("Moreover, in a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations."), reh'g en banc denied (Fed. Cir.), cert. denied, 540 U.S. 937 (2003).

The Federal Circuit has explained that procurement officials have an even greater degree of discretion when it comes to best-value determinations, as compared to deciding on price alone.   See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."   (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

When the contracting officer's discretion grows, so does the burden on the protestor.  As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer.  DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007).  Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion.  Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy."  Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'"  (citations omitted)).  "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value."  Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28; E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

Despite the forgoing deference typically afforded a contracting officer in a bid protest review, this court will overturn an agency's decision as arbitrary and capricious if it "'entirely failed to consider an important aspect of the problem.'"  SKF USA Inc. v. United States, 630 F.3d 1365, 1374 (Fed. Cir. 2011) (quoting Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. at 43); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013) (applying the standard in a bid protest dispute); Linc Gov't Servs., LLC v. United States, 108 Fed. Cl. 473, 489 (2012) (same).

The protestor, FCN, argues that the decision by the Air National Guard to award a contract pursuant to Solicitation W9133L-13-R-0015 to RGS was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  As noted above, the protestor now brings three protest grounds to the court for consideration, a challenge to (1) how the Air National Guard treated the proposed use of government-

furnished property by RGS, (2) how the Air National Guard conducted its price realism analysis, and (3) RGS' inclusion of pricing information in its mission capability proposal.[30]

<u>Government-Furnished Property</u>

The protestor alleges that "accepting a proposal that relied on RGS's offer to utilize Government Furnished Equipment (GFE) software licenses and a telephony-based communications system allegedly in the possession of another Government Agency violated the FAR requirements for the offer, acceptance, and use of GFE in federal government contracts pursuant to FAR Part 45."   The protestor maintains that "[i]t is clear from the Administrative Record that the Agency Evaluators thought that RGS was offering GFE."   The protestor argues that when an offeror proposes using GFE, the FAR requires that "'Agencies ***shall*** . . . [e]liminate to the maximum practical extent any competitive advantage a prospective contractor may have by using Government property.'"   (quoting FAR § 45.103(a)(2) (2013)) (emphasis and modification in original).   According to the protestor, however, the Air National Guard ignored FAR Part 45 and "made no effort to eliminate in any way the competitive pricing advantage that RGS and AtHoc held in proposing to use Government property."   Furthermore, the protestor claims that the Solicitation failed to "include sufficient information that would demonstrate that RGS's proposed GFE would be available for use under this contract," and that the Air National Guard failed to consider the other requirements that accompany the use of government-furnished property, which RGS allegedly failed to meet in its proposal.   FCN claims, in the alternative, that because pursuant to FAR § 45.000(b)(4), "[s]oftware and intellectual property" are exempt from FAR Part 45, "it seems equally valid to say that FAR 45.000 acts as a bar to offering software and intellectual property as GFE."   <u>See</u> FAR § 45.000 ("Scope of part").

Defendant does not dispute that FAR Part 45 applies to government-furnished property,[31] or that the Air National Guard believed that certain parts of the RGS

---

[30] As stated above, the protestor withdrew a fourth protest ground alleging a conflict of interest.

[31] The parties mostly use the term "government-furnished equipment" or "GFE," but also refer to FAR Part 45, which contain the federal acquisition regulations regarding "[g]overnment property" and "[g]overnment-furnished property." FAR Part 45 does not refer to "government-furnished equipment," and draws distinctions between different types of government property.  For example, government-owned equipment falls within the definition of government property, however, government-furnished equipment falls within the definition of government-furnished property. <u>See</u> FAR § 45.101 (2013); 72 Fed. Reg. 27366 (May 15, 2007) (In a recent update to the FAR, the government, responding to why the "Property" was chosen to replace "Plant equipment" in FAR section 45.000, stated that the term "Property" "is more appropriately used because it is more inclusive and more definitive."); <u>see also</u> <u>Teledyne Lewisburg v. United States</u>, 699 F.2d 1336, 1344, 1354 (Fed. Cir. 1983) (interchanging between the terms); <u>Harris Patriot Healthcare Solutions, LLC v. United States</u>, 95 Fed. Cl. 585, 594 (2010).

proposal included government-furnished property.    As discussed below, however, defendant is not consistent in its arguments regarding government-furnished property or the agency's understanding of RGS' proposal.  Defendant argues, however, that the Air National Guard's failure to consider FAR Part 45 is immaterial since, "the ANG did not decide that RGS's proposal was the best value because it used government property. The ANG awarded the contract to RGS because RGS offered the lowest price and committed to provide sufficient software licenses . . . ."  Defendant further argues that, to whatever extent RGS utilized government-furnished property, FCN did the same because FCN did not include the cost of [redacted] Desktop Alert licenses in its proposal.  At the same time, defendant also, inconsistently, argues that, "neither the telephone alerting system nor the IWSAlerts software licenses in RGS's proposal are in fact Government-furnished property.  Instead, both are components of AtHoc's IWSAlerts system."

Defendant has been unable, after multiple requests from the court, to provide sufficient information to explain the ownership and transferability to the Air National Guard of the Air Force licenses and telephony capability, which RGS intended to "leverage" as part of its winning proposal.  At the hearing before this court, in response to the court's straightforward question - what is the licensing situation? - counsel for the defendant, after conferring with agency representatives at counsel table, stated that "the Guard is in the process of working through those issues right now with the Air Force," and that the government is "checking on the transferability of the licenses . . . ." Defendant also has been unable to offer a reason as to why it could not find any of the United States Air Force - AtHoc license agreements, and could only indicate that the process for searching for them is complicated, and that the licenses are "spread out among the -- all the Air Force," with multiple contracts involved.   Moreover, the contracting officer declared during the protest at the GAO: "I recognize that the transferability issue was not 100% verified prior to my award decision, however, I believe that our agency's examination of this issue was reasonable."  To date, no supplemental documents to address these issues have been submitted to the court.

The record before the court only contains the text of one, apparently unrelated AtHoc software license provision from an unrelated Air Force contract, the 2011 Defense Information Services Agency – Defense Information Technology Contracting Organization contract with [redacted], contract [redacted].  The [redacted] contract was included in AtHoc's objections to the September 22, 2012 subsequently cancelled solicitation, W9133L-12-R-0073, in the RGS price proposal, and in the RGS response to the Source Selection Evaluation Board's April 2, 2013 questionnaire.  The [redacted] contract contained the following licensing provisions:

1. AF [Air Force] shall be entitled to operate the software on any platform the software Vendor supports and transfer the software or maintenance between platforms.  There shall be no additional charge for transferring software from site-to-site or machine-to-machine where AF maintains AF Service responsibilities as long as the scope of license is materially similar.  There shall be no additional cost transferring maintenance from

site-to-site or machine-to-machine where AF maintains AF Service responsibilities as long as the maintenance requirements and scope of service are materially similar (e.g., number of data centers, sites, operators or end-users supported).

2. Should there be a restructuring of AF or its mission during the life of the contract, the contractor agrees that AF's software licenses, capacity levels, usage rights, entitlements and contracts shall transfer to the successor DoD organization(s) to which AF may transfer its responsibilities for computing services for the AF.

Although these provisions may indicate that the Air Force is "entitled" to some transferability of the licenses at no charge, there are a number of limiting conditions, such as "as long as the scope of license is materially similar," and   "[s]hould there be a <u>restructuring of AF or its mission</u> during the life of the contract."  (emphasis added).  The April 2, 2013 e-mail from Mr. Bartoli, a civilian employee from the Air Force Materiel Command to Mr. Anderson, the Vice President for Business Development, Defense & International for AtHoc, indicated that the [redacted] contract "does include the referenced verbiage for no cost transfer of licenses; that we did exercise this right; and that the transfers were made available for reuse by the AF Program Management Office."  The court notes that it is not clear from the record whether the Bartoli e-mail was read by the Source Selection Evaluation Board before the award decision was made, or that the transferability included to the Air National Guard.  The June 5, 2013 e-mail from Mr. Rau to Mr. Holmes, which tries to suggest that the licensing provisions quoted above are typical in current United States Air Force contracts, was written after the April 17, 2013 decision to award the contract to RGS.  Mr. Rau stated in his e-mail, "the AFMC's [Air Force Materiel Command's] renewal incorporated an [sic] change in the licensing agreement to allow the use of the AFMC licenses anywhere within the Air Force . . . ."  Mr. Rau's statement, however, appears to have come from information provided by AtHoc, as he indicated, "[i]t was then that AtHoc revealed to us that the Air Force has purchased sufficient licenses thru numerous procurements to cover the total Air Force need." Moreover, none of the information in the record contains conclusive statements which confirm the transferability or numerical sufficiency of the licenses for use in the contract awarded pursuant to the Solicitation currently under review by this court.  In fact, the parties have jointly stipulated that:

The contract RGS provided is not enterprise-wide across all the Air Force, but is restricted to one command.  The contract does not state the number of licenses provided, does not indicate that the Air Force would be receiving extra or surplus licenses that could later be transferred, and does not indicate that the Air Force would be willing to give up any or all the licenses provided under that contract.

(internal citations omitted).  Additionally, the parties have stipulated that "[t]he RGS proposal did not specify how many licenses the Air Force was using, and the proposal did not provide proof that the Air Force committed to transfer the licenses to the ANG, or

allow the ANG to use the licenses, permanently, temporarily or under any other conditions."  (internal citations omitted).

Regarding the telephony system, no contracts, contract provisions, or other definitive information are in the record to help the court understand RGS' or AtHoc's contractual relationship with the Air Force or what government property would potentially be available to the Air National Guard for utilization with the RGS proposal. For example, the proposal submitted by RGS indicates, at times, that the physical telephony hardware is owned by AtHoc or third party "commercial data centers," but also indicates in other places that the United States Air Force owns the lines, has "reserved lines," or leases the lines.  In its mission capability proposal, RGS stated: "Once ANG joins all other MAJCOMs in using Company A [AtHoc], ALL ANG units will have access to the existing AF Enterprise Telephone Alerting capability; over [redacted] telephone lines activated simultaneously, with firm fixed price for unlimited telephone and text message alerts."

In its price proposal, RGS refers to the [redacted] telephone lines that make up the current telephony capability as being "[o]wned" by the United States Air Force.  The RGS price proposal also indicated: "Instead of having to lease additional dedicated alerting communications lines for ANG unit use, ANG can leverage the operational USAF Enterprise Telephone Alerting capability."  The [redacted] contract, discussed above, includes as equipment under the contract, "Telephony Comm Service" for [redacted] "[r]eserved" lines. From all the statements made by RGS and the government, it is still unclear what is owned, leased or to be provided.  It is possible that the Air Force, for example, could have a lease on the [redacted] telephone lines, in which case the United States Air Force might possess government property, but the issue of transferability would remain.  See FAR § 45.101 ("Government property means all property owned or leased by the Government.").  It is also possible the Air Force could have access to the necessary capability through a services contract, which defendant at one point alleges in its brief.  Defendant claims that, "[a]s described in RGS's proposal, the Air Force 'Enterprise Alerting Capability' is a contracted telephone alerting service that AtHoc provides to the Air Force through multiple 'commercial data centers.'" It appears, therefore, from the record before the court that there is a lack of definition as to what RGS offered in its proposal, let alone a clear indication of what, if any, government furnished-property the government had to offer as part of a contract awarded pursuant Solicitation W9133L-13-R-0015.  As noted above, during the GAO protest, the contracting officer, as the source selection official, indicated: "I recognize that the transferability issue was not 100% verified prior to my award decision." Moreover, months later, at a hearing in this court, with agency personnel and agency counsel present, defendant's Department of Justice counsel stated that "the Guard is in the process of working through those issues right now with the Air Force," and that the government is "checking on the transferability of the licenses."

It also appears from the record before the court that the Air National Guard contracting officer, as the source selection official, proceeded to award the contract to RGS, without investigating or forming an understanding of whether or not the Air

National Guard could use of Air Force government property, for performance of the contract to be awarded under Solicitation W9133L-13-R-0015.  Although, as noted above, contracting officers are given significant discretion in negotiated best-value procurements, see Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355, the Air National Guard's decision still must be founded on a "rational basis," and a "'coherent and reasonable explanation of its exercise of discretion.'"   Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 (quoting Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Agency discretion "does not relieve the agency of its obligation to develop an evidentiary basis for its findings."  In re Sang Su Lee, 277 F.3d at 1344; see also Patriot Taxiway Indus., Inc. v. United States, 98 Fed. Cl. 575, 583 (2011); Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 302 (2011).  Defendant's admission at a hearing before this court that the government, more than six months after contract award, still was unable to locate the software licenses under consideration, together with the absence in the record of any additional information as to a contractual relationship between Air Force and AtHoc regarding the telephony capability and its transferability, demonstrates that the agency did not have a reasoned, rational basis for its finding of the transferability and availability of licenses, thus relieving the court of the normal deference due to agency decision-making.  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332.

Although having incomplete information, the Source Selection Evaluation Board and the contracting officer, acting as the source selection official, both blindly accepted that the software licenses and telephony services were government-owned property and available.   The Source Selection Evaluation Board commented in its Technical Evaluation Summary on RGS' "cost savings for utilizing existing GFE," without clarifying, or having a clear understanding, whether the "existing GFE" meant the licenses, the telephony capability, or both, and whether or not the items were government property, and, if so, could be could transferred.  The Source Selection Evaluation Board did ask the offerors in its April 2, 2013 questionnaire "[i]f costs are figured with the idea that licensing is covered by GFE; will the vendor provide in writing and signed by the appropriate government official proof of such claim."  In Mr. Wilson's June 12, 2013 after-the-fact declaration during the GAO protest, regarding the e-mail from Mr. Bartoli, he stated: "In my view, then and now, the email string supports RGS's express affirmation that they would provide licenses as GFE in line with their proposal." Neither the Source Selection Evaluation Board, nor the contracting officer, as the source selection official, however, indicated concern with RGS' description of the software licenses or the [redacted] telephone lines in its price proposal as "[a]lready [o]wned by the USAF" when RGS was awarded the contract, implying that they were government-owned and, by implication, would be furnished by the government.[32]  The Air National Guard officials did not fully investigate or address the status of the potential

_____

[32] Because the software licenses and telephony capability were described as "owned" by the Air Force, not the Air National Guard, this could have created possible, additional, unexplored layers of ownership or control of the alleged government-furnished property.

government-furnished property, including ownership and transferability issues, or the possible requirements or implications of FAR Part 45.

Having concluded RGS' offered utilized government-furnished property as part of its proposal, the agency officials, however, chose not to consider or apply FAR Part 45. The FAR defines "government property" as follows:

> all property owned or leased by the Government.  Government property includes both Government-furnished property and contractor-acquired property.   Government property includes material, equipment, special tooling, special test equipment, and real property.  Government property does not include intellectual property and software.

FAR § 45.101 (2013); see also FAR § 52.245-1 (2013) (repeating the same provision). The same regulation also provides that, "[p]roperty means all tangible property, both real and personal."  FAR § 45.101.

"Government-furnished property" is defined under the FAR to include:

> property in the possession of, or directly acquired by, the Government and subsequently furnished to the contractor for performance of a contract. Government-furnished property includes, but is not limited to, spares and property furnished for repair, maintenance, overhaul, or modification. Government-furnished property also includes contractor-acquired property if the contractor-acquired property is a deliverable under a cost contract when accepted by the Government for continued use under the contract.

FAR § 45.101 (emphasis added); see also FAR § 52.245-1 (repeating the same provision).

FAR Part 45, if implicated, places a number of requirements on the government to allow for the use of government-furnished property by an offeror.  FAR Part 45, however, was not meant to limit the use of government property by contractors, but rather to regulate it, if government property is to be utilized and FAR Part 45 is triggered.  See FAR § 45.000(a) ("This part prescribes policies and procedures for providing Government property to contractors; contractors' management and use of Government property; and reporting, redistributing, and disposing of contractor inventory.").  FAR § 45.102 notes that "[c]ontractors are ordinarily required to furnish all property necessary to perform Government contracts."  FAR § 45.102 (2013). FAR § 45.102, however, provides the evaluation requirements for contracting officers must follow when government-furnished property is part of a  solicitation, as follows:

> (b) Contracting officers shall provide property to contractors only when it is clearly demonstrated—
>
> > (1) To be in the Government's best interest;

(2) That the overall benefit to the acquisition significantly outweighs the increased cost of administration, including ultimate property disposal;

(3) That providing the property does not substantially increase the Government's assumption of risk; and

(4) That Government requirements cannot otherwise be met.

Id.; see also Space Gateway Support [SGS], LLC, ASBCA No. 55608, 2013 WL 518974 (Jan. 29, 2013) ("FAR Part 45 set forth numerous rules for the handling of government furnished property, such as procedures for identifying and maintaining such property, arid [sic] had to be consulted by contractors such as SGS receiving government property. See, e.g., FAR 45.000.").

Under FAR § 45.103(a), "[a]gencies shall . . . (2) [e]liminate to the maximum practical extent any competitive advantage a prospective contractor may have by using Government property;[33] . . . (5) [c]harge appropriate rentals when the property is authorized for use on other than a rent-free basis."   FAR § 45.103(a)(2), (5) (2013). FAR § 45.202 repeats the requirement for offsetting any competitive advantage from possession or use of government property, during the evaluation of proposals, as follows:

(a) The contracting officer shall consider any potentially unfair competitive advantage that may result from an offeror or contractor possessing Government property.  This shall be done by adjusting the offers by applying, for evaluation purposes only, a rental equivalent evaluation factor as specified in FAR 52.245–9.

(b) The contracting officer shall ensure the offeror's property management plans, methods, practices, or procedures for accounting for property are consistent with the requirements of the solicitation.

FAR § 45.202 (2013).

FAR § 45.107 mandates the inclusion of a contract provision provided in FAR § 52.245-1 into "[f]ixed-price solicitations and contracts when the Government will provide Government property."  See FAR § 45.107(a)(1)(ii) (2013).  FAR § 45.201 also adds the following minimum inclusion requirements upon the agency when government-furnished property is anticipated in the Solicitation:

---

[33] FAR § 45.103(a)(4) includes a requirement for "contractors to use Government property already in their possession to the maximum extent practical in performing Government contracts."  FAR § 45.103(a)(4).

(a) The contracting officer shall insert a listing of the Government property to be offered in all solicitations where Government-furnished property is anticipated (see [FAR] 45.102). The listing shall include at a minimum--

>(1) The name, part number and description, manufacturer, model number, and National Stock Number (if needed for additional item identification tracking and management, and disposition);

>(2) Quantity/unit of measure;

>(3) Unit acquisition cost;

>(4) Unique-item identifier or equivalent (if available and necessary for individual item tracking and management); and

>(5) A statement as to whether the property is to be furnished in an "as-is" condition and instructions for physical inspection.

(b) When Government property is offered for use in a competitive acquisition, solicitations should specify that the contractor is responsible for all costs related to making the property available for use, such as payment of all transportation, installation or rehabilitation costs.

(c) The solicitation shall describe the evaluation procedures to be followed, including rental charges or equivalents and other costs or savings to be evaluated, and shall require all offerors to submit the following information with their offers--

>(1) A list or description of all Government property that the offeror or its subcontractors propose to use on a rent-free basis. The list shall identify the accountable contract under which the property is held and the authorization for its use (from the contracting officer having cognizance of the property);

>(2) The dates during which the property will be available for use (including the first, last, and all intervening months) and, for any property that will be used concurrently in performing two or more contracts, the amounts of the respective uses in sufficient detail to support prorating the rent;

>(3) The amount of rent that would otherwise be charged in accordance with FAR 52.245–9, Use and Charges; and

(4) A description of the offeror's property management system, plan, and any customary commercial practices, voluntary consensus standards, or industry-leading practices and standards to be used by the offeror in managing Government property.

(d) Any additional instructions to the contractor regarding property management, accountability, and use, not addressed in FAR clause 52.245–1, Government Property, should be specifically addressed in the statement of work on the contract providing property or in a special provision.

FAR § 45.201 (2013).  None of the FAR Part 45 provisions were included as clauses by reference or otherwise in the Solicitation or in the contract awarded to RGS, nor does the Solicitation or the contract award to RGS contain any reference to FAR Part 45, or to government-furnished property.  Additionally, FAR 52.245-1 is not included in the Solicitation or the contract award to RGS.

RGS specifically identified in its price proposal:

Because existing USAF IWSAlerts licenses are available as GFE, they will be reallocated and distributed for ANG use. This significantly reduces the cost of implementing an ANG Enterprise solution because the software costs would typically be by far the most expensive portion of this contract-here they are simply GFE.  This proposal pricing includes the necessary licenses as GFE.  As a frame of reference, both PACAF [Pacific Air Forces] and AMC [Air Mobility Command] enjoyed the same.

Given that RGS proposed to utilize government-furnished property, and because RGS indicated that the use of government-furnished property would eliminate what would likely be the most expensive component of the contract, the requirements of FAR Part 45 should have been considered by the offerors to the Solicitation, the Source Selection Evaluation Board, and the contracting officer, as the source selection official.  Perhaps because the Air National Guard could not establish at the time of contract award the extent, if any, of the government property involved, the agency chose not to do a FAR Part 45 analysis or include the necessary FAR clauses.  There is no evidence in the record that the Air National Guard met the requirements of FAR Part 45, much less considered them in evaluating the proposals.  The Air National Guard, therefore, did not even try to eliminate any "competitive advantage" that might have resulted, pursuant to the requirements of FAR §§ 45.103(a)(2) and 45.202(a).  There was no evidence a rental charge was added or other price adjustment made.  See FAR §§ 45.103(a)(5), 45.201(c).  The contracting officer should have taken notice of the policies expressed in FAR § 45.102(b), and evaluated if RGS's alleged provision of government-furnished property increased based on established information, "the Government's assumption of risk" or "cost of administration."  FAR § 45.102(b).  The contracting officer also should

have made an effort to "ensure the offeror's property management plans, methods, practices, or procedures for accounting for property are consistent with the requirements of the solicitation." FAR § 45.202.

Given how little information the Air National Guard obtained on the alleged government property the RGS proposal offered for use during contract performance, or even how little information the agency had, even months after the award, as well as after the above captioned protest was filed in this court, it does not seem possible that the Air National Guard could have complied with the FAR Part 45 requirements or made a rational decision that was not arbitrary and capricious. Nonetheless, the agency blindly accepted that government-furnished property was part of the RGS proposal.

Defendant contends that FAR Part 45 is immaterial to the selection of RGS because "the ANG did not decide that RGS's proposal was the best value because it used government property." This is not a persuasive argument. As noted above, the rationale for the award decision, as stated by the contracting officer in the debriefing letter to FCN:

> As stated in the solicitation, the Government sought to award this contract to the offeror deemed to provide the *best value* to the Government. As reflected in the adjectival ratings, the Government found that your company submitted an outstanding proposal for this contract. The Government evaluators and I also found your past performance to merit the highest rating in this competition. The awardee's proposal was found to be equal to yours in terms of the technical and past performance rating. As such, the main discriminator became the significantly lower price offered by the RGS. I recognize that price was the least important factor in this competition, however, in light of the relative equivalence of your proposal and the awardee's proposal, the significantly lower price submitted by RGS tipped the scales clearly in their favor.

(emphasis in original). Considering that price was the determining factor for the best value award to RGS, and RGS' price was heavily impacted by the proposal to use of government-furnished property, the use, or non-use, of government-furnished property was relevant to the selection decision.

Moreover, it is remarkable that the agency's evaluation of the proposals was completed before the Air National Guard had an understanding of whether government property was involved, and if so, the extent of such property and its availability. Prior to the award decision, the agency was at least aware of the potential issues as it found it necessary to issue the April 2, 2013 questionnaire to the offerors in the competitive range after receiving all the proposals. Although apparently still without the necessary information as to the status of government-furnished property to be used during performance of the contract, the Source Selection Evaluation Board stated that "[a]ll Offerors response [sic] confirmed their original claim, stating in writing that there's 'NO RISK' to the ANG in terms of licensing." (capitalization in original). After receiving the

responses, the Source Selection Evaluation Board noted the "cost savings for utilizing existing GFE" in its Technical Evaluation Summary, indicating that the Source Selection Evaluation Board appreciated RGS' general approach to use government-furnished property, without having the opportunity to consider the burdens or risks that might come with the use of government-furnished property.  See FAR §§ 45.103(a)(2), 45.201(d), 45.202(b).  The assessment, and necessary minimization, of a competitive advantage as a result of the use of government-furnished property could have impacted how the Source Selection Evaluation Board evaluated RGS, [redacted], and FCN equally on non-price factors.  The contracting officer, as the source selection official, noted that "these three acceptable proposals were truly equal in my view in terms of their non-price factor ratings."  Moreover, an analysis of the risk to project completion also could have been impacted as neither the agency nor RGS could confirm if government property would be available or available in sufficient quantities for contract performance.

Although the defendant had previously agreed that government-furnished property was part of the RGS and [redacted] proposals, in some of the defendant's arguments to this court, defendant now contends that the government's failure to consider or comply with FAR Part 45 is excusable since "neither the telephone alerting system nor the IWSAlerts software licenses in RGS's proposal are in fact Government-furnished property.  Instead, both are components of AtHoc's IWSAlerts system."  The defendant makes this argument despite the Source Selection Evaluation Board's statement that the RGS proposal implements "cost savings for utilizing existing GFE." Defendant now tries to maintain that any reference in the RGS proposal or otherwise to government-furnished property is incorrect, and that the court should ignore those statements.  Defendant indicates that "though RGS's proposal declared IWSAlerts licenses to be 'GFE,' the proposal did not definitively establish that the Air Force could, or would, allow the ANG to use them."  Defendant states that "RGS is not a party to the contract it asserts grants the Air Force the right to transfer IWSAlerts to the ANG, so its interpretation of the contract carries little weight." (internal citations omitted).  Defendant also alleges that the Air National Guard's decision to label the licenses as government-furnished property is irrelevant, because "[t]he ANG awarded the contract to RGS because RGS offered the lowest price and committed to provide sufficient software licenses regardless of whether the Air Force could or would transfer IWSAlerts licenses."  Furthermore, defendant states that "[s]oftware is expressly excluded from the scope of FAR Part 45 and the definition of Government property." Regarding the AtHoc telephony capability, defendant maintains that the telephony alerting system is a hosted service, with the physical hardware located in data centers owned by AtHoc in Denver, San Diego, and Chicago, which tie into "major carrier backbones," and that the United States Air Force merely contracts for its use.  Therefore, according to defendant, the telephony capability is not owned by the government, but "the Air Force pays a firm-fixed price to AtHoc for TAS [Telephone Alerting System] services as part of IWSAlerts."

The protestor responds that the AtHoc licenses and telephony system proposed by RGS are indeed government-furnished property.  At the hearing, the protestor, when discussing the AtHoc licenses and telephony system, stated both items were treated "as

what the [RGS] cost proposal itself identifies as government-furnished property.  So, there was no question that they were proposing the government-furnished [property]." Regarding the licenses, protestor argues that, "[e]ven though it's in the form of a license, it's still . . . owned property, and this property has value."  The protestor notes that the RGS proposal stated, "[i]nstead of having to lease additional dedicated alerting communications lines for ANG unit use, ANG can leverage the operational USAF Enterprise Telephone Alerting capability."  In addition, the protestor responds to the defendant that "[t]he Government [sic] new position is totally inconsistent with the evaluators' and the SSA's [source selection authority's] position," and this should be enough to set aside the award.  Finally, FCN added at a hearing that the government's change in view "alone just totally undermines the evaluation."

Defendant's more recent assertions before this court that no government property was relied upon as part of the RGS proposal, even if they were to turn out to be correct, are not dispositive of whether the evaluations and selection decision by the agency were arbitrary or capricious.  The determination of whether or not government-furnished property is part of the RGS proposal is a fact-specific question based on the record before the court.  The record establishes that at the time of the evaluation and RGS' selection, the agency had insufficient information to make such determinations. If government-furnished property is involved, the agency did not review the proposals in accordance with FAR Part 45.  The court cannot rely on the defendant's after-the-fact arguments, offered by counsel for the defendant, especially when the explanations differ greatly from the information in the record of what information was considered at the time of award.  No complete explanation regarding the use of government-furnished property has been offered to the court. Whether or not RGS' telephony capability involves government property also remains unclear. The defendant has not offered information to permit an understanding of the specifics of the availability, extent, and ownership of the telephony capability RGS offered and the contracts RGS or AtHoc have or had with the Air Force.

In sum, defendant counsel's unsupported reversal on behalf of his client from the agency's previously stated position as to whether government-furnished property was offered and available for RGS' proposal is not sufficient to counter the agency's action or inaction during the evaluations.  Moreover, based on the record before the court, RGS' proposed use of government-furnished property appears to have been considered a positive element of RGS' proposal during the Source Selection Evaluation Board's review, and to the selection decision to award to RGS.  Even if the licenses and telephony services offered by RGS turn out not to be government-furnished property, the agency "offered an explanation for its decision that runs counter to the evidence before the agency."  See Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d at 1375; see also Motor Vehicle Mfgs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)); GHS Health Maint. Organization, Inc. v. United States, 536 F.3d 1293, 1303 (Fed. Cir. 2008); Supreme Foodservice GmbH v. United States, 109 Fed.

Cl. at 384.  If, however, items offered under RGS' and [redacted's] proposal turn out to be government-furnished property, and therefore, subject to the rules included in FAR Part 45, then the Air National Guard "entirely failed to consider an important aspect of the problem."  SKF USA Inc. v. United States, 630 F.3d at 1374.  Regardless, the agency made its selection based on insufficient and incomplete information, in an uninformed fashion, without having conducted sufficient inquiry to make a rational decision which was not arbitrary or capricious.

The Price Realism Analysis

        The protestor also argues that Mr. Wilson, the contracting officer and source selection official, "made a casual and unsupported finding 'that five of the six price proposals that included options [are] realistic.'"  (modification in original).  The protestor further alleges that the Air National Guard failed to conduct a proper price realism analysis, including "to determine that RGS's pricing strategy to utilize software licenses and a telephony system allegedly sold to the U.S. Air Force was inadequate to guarantee that RGS could perform the requirements of the contract."  FCN maintains that RGS proposed its Mass Notification System software licenses for free claiming that "the 'USAF already purchased sufficient Company A [AtHoc] licenses to cover [redacted] personnel, including [redacted].'"  (modification and capitalization in original).  According to the protestor, however, the record before the court indicates that the Air Force could not necessarily transfer the licenses to the Air National Guard, creating a risk of non-performance.  The protestor also maintains that, in order to offer a low-cost telephony option, RGS proposed to have the Air National Guard share use of the Air Force's Enterprise Telephone Alerting capability, including access to [redacted] telephone lines.  According to the protestor, however, RGS offered "no explanation as to how the Air Force would share these lines or whether the shared use would interfere" with, or interrupt, other Air Force operations.

        The protestor admits that with a fixed-price contract, such as the one awarded pursuant to the Solicitation at issue, "an agency may, but is not required to consider whether the offered price is realistic."[34]  The protestor argues, however, that when a solicitation calls for a price realism analysis, the "Agency is required to follow the evaluation terms as stated in the RFP."  According to the protestor, however, in this case, the Air National Guard should have, but did not, conduct a price realism analysis that should have included determining if "the SSA had a duty to understand and

---

[34] "'Where the award of a fixed-rate contract is contemplated, the realism of offerors' proposed labor rates is not ordinarily considered since a fixed-rate contract . . . places the risk and responsibility of contract price and resulting profit or loss on the contractor.'"  Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 356 (2009) (quoting Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 755 (2008) (modifications in original) (citing PharmChem, Inc., B–291725.3, 2003 WL 21982424 (Comp. Gen. July 22, 2003))).  The procuring agency, however, "may provide for a price realism analysis in the solicitation of fixed-price proposals."  See id. (citing Hydraulics Int'l, Inc., B–284684, 2000 WL 1371001, at *10–11 (Comp. Gen. May 24, 2000)).

investigate the viability of a [redacted] discount on a [redacted] procurement."

Defendant claims a price realism analysis is only justified when the price offered is too low, which, according to defendant, is an unsupported assumption by the protestor.  Defendant contends that an agency's responsibilities under a price realism analysis are far more limited than the protestor suggests, that the extent of a price realism analysis is at the discretion of the agency, and that such an analysis is not intended to "guarantee" performance.  Defendant claims that a price realism analysis is designed to ensure the offeror understands the agency requirements in the solicitation, and does not require the government to "investigate" whether an awardee can deliver on the contract.  Defendant contends that evaluation of performance risk falls under responsibility determinations, under FAR Part 9, rather than under a price realism analysis, recognized in FAR Part 15.[35]  Defendant also maintains that rejection of a contracting officer's responsibility determination requires that the contracting officer have acted "irrationally or in bad faith"[36] and absent irrationally or bad faith, the court should defer to the good faith efforts of the contracting officer.

The Solicitation at issue in this protest, in describing how offeror prices will be evaluated, indicates that "[t]he Total Contract Life Price will be evaluated for completeness, accuracy, reasonableness[37] and realism, using the techniques in FAR 15.404-1(b)(2)." (emphasis added).  The Solicitation language stated that the Total

---

[35] In support, defendant quotes from Virgin Island Paving, Inc. v. United States, 103 Fed. Cl. 292, 306 (2012), which stated "'whether a bidder will be able to perform the contract in light of a low bid price is a matter of responsibility.'"  (quoting Neal R. Gross & Co., B-217508, 1985 WL 52593 at *2 (Comp. Gen. Apr. 2, 1985)).  The court notes that although the decision in Virgin Island Paving, Inc. mentions price realism, the decision concentrates on discussion of responsibility.  See id.

[36] The protestor has not alleged bad faith by the agency.

[37] Price realism and price reasonableness are not the same.  "'[T]he purpose of price reasonableness analysis is to ensure that the offeror's price is not unreasonably high or unreasonably low.'  This is distinct from price realism, which seeks to 'ensure that an offeror understands the solicitation requirements and actually can perform those requirements.'"  Distributed Solutions, Inc. v. United States, 106 Fed. Cl. 1, 21 (2012) (quoting Erinys Iraq Ltd. v. United States, 78 Fed Cl. 518, 531, appeal dismissed (Fed. Cir. 2007))) (internal citations omitted); see also Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. at 303 n.15 ("The evaluation of price reasonableness is designed to prevent the Government from paying too high a price for a particular contract." (citing DMS All–Star Joint Venture v. United States, 90 Fed. Cl. at 663 n.11)); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. at 657 n.5 ("At the risk of over-simplification, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work.  A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened."); Serco, Inc. v. United States, 81 Fed. Cl. 463, 494 n.48 (2008).

Contract Life Price will be evaluated for "realism."  The Solicitation also indicates that the "Government will examine price proposals for artificially low unit prices.  Offers found to be unreasonably high, unrealistically low (an indication of 'buy–in'), or unbalanced, may be considered unacceptable . . . ."  Additionally, the Solicitation stated that "[i]ndications of potential underbidding or unbalanced pricing will be reflected in the cost/pricing report and may impact the ratings for non-price factors as such indications may be determined to indicate a lack of understanding of the requirement."  In the protest before this court, the contracting officer appears to have conducted some minimum level of price realism analysis, as he indicated in the source selection decision document that "I found that five of the six price proposals that included options to be realistic. Realism was evaluated in terms of the price proposed was [sic] found appropriate to the technical solutions offered."  (emphasis added).

The extent of a price realism analysis for each procurement can vary, and generally is within the discretion of the agency.  See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 (2013) ("'[U]nless the agency commits itself to a particular methodology in a solicitation,' Afghan Am[er. Army Servs. Corp. v. United States,] 90 Fed. Cl. at 358, 'the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion.'"  (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 357–58)).  "The FAR does not mandate any particular method of conducting a price realism analysis and 'the nature and extent of a price realism analysis, as well as an assessment of potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion.'" D & S Consultants, Inc. v. United States, 101 Fed. Cl. at 33 (quoting Pemco Aeroplex, Inc., B-310372.3, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008)); Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. 103, 118 (2011) ("The Solicitation does not describe the methodology required to conduct the price realism analysis. Accordingly, DeCA [Defense Commissary Agency] 'enjoy[s] broad discretion in conducting its price realism analysis.'" (quoting DMS All–Star Joint Venture v. United States, 90 Fed. Cl. at 665) (internal citations omitted)); Ceres Evntl. Servs., Inc. v. United States, 97 Fed. Cl. at 303 ("The nature and extent of an agency's price realism analysis, as well as an assessment of potential risk associated with a proposed price, are matters within the agency's discretion."); PharmChem, Inc., 2003 WL 21982424, at *6 ("The nature and extent of an agency's price realism analysis are matters within the sound exercise of the agency's discretion."); see also Cohen Fin. Servs., Inc. v. United States, 112 Fed. Cl. 153, 167 (2013) ("[T]he Solicitation and the FDIC regulations gave the Panel broad discretion in conducting price realism analysis, and the court applies a highly deferential standard of review in bid protest cases.").  Moreover, the United States Court of Appeals for the Federal Circuit has held that a price realism analysis need not extend outside of what is mandated by the solicitation.  See Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d at 1375–76 ("The trial court's duty was to determine whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP, not to introduce new requirements outside the scope of the RFP."  (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); see also Orion Tech., Inc. v. United States, 704 F.3d at 1351 ("Agencies are entitled to a high degree of deference when

faced with challenges to procurement decisions."). In a negotiated procurement, based on best value, the contracting officer's discretion is even higher. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355; Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. at 650 ("The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation."). The protestor's burden is not insurmountable; for example, "if an agency made '"irrational assumptions or crucial miscalculations,"' the court may find that the agency's price realism analysis lacked a rational basis." Mil-Mar Century Corp. v. United States, 111 Fed. Cl. at 541 (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 358 (quoting OMV Med., Inc. v. United States, 219 F.3d at 1344)); D & S Consultants, Inc. v. United States, 101 Fed. Cl. at 33 (citing OMV Med., Inc. v. United States, 219 F.3d at 1344).

Because a price realism analysis was contemplated by the Solicitation, one had to be conducted, as the Solicitation stated that unrealistically low offers "may be considered unacceptable and rejected on that basis." See Linc Gov't Servs., LLC v. United States, 108 Fed. Cl. at 500; see also Logistics 2020, Inc., B-408543, 2013 WL 6235560, at *6 (Comp. Gen. Nov. 6, 2013) ("Given the solicitation's express statement that proposals would be evaluated to determine if prices were unrealistically high or low, we see no basis for any conclusion other than that the agency committed itself to a review of price realism.") (internal quotations omitted); Esegur-Empresa de Segurança, SA, B-407947, 2013 WL 1898790, at *3 (Comp. Gen. Apr. 26, 2013) ("The RFP's use of the term 'may' in this instance refers to the agency's discretion to reject an unrealistically low price, as opposed to reserving to the agency the right to evaluate prices for realism in the first instance."). Given that the Solicitation instructed that "[t]he Total Contract Life Price will be evaluated for . . . realism," together with the indication by the contracting officer, as the source selection official in his source selection decision document that he had conducted some level of price realism analysis, the protestor argues that the agency's price realism analyses should have covered "risks to performance of the contract by its proposed approach or its pricing." The protestor relies on two decisions, Academy Facilities Management v. United States, 87 Fed. Cl. 441 (2009), issued by the undersigned, in which the protestor alleged "the Agency undertook a specifically identified pricing analysis conducted by a Price Evaluation Panel involving various comparisons of price," and Electronic Hardware Corporation, B–295345, 2005 WL 3681971, at *3–4 (Comp. Gen. Jan. 28, 2005), in which the protestor alleges the agency "documented an effort to understand the proposed pricing, establish parameters, establish target pricing, and provide the offerors with this information during discussions."[38]

---

[38] The defendant also relies on the same two decisions for the proposition that "asking the awardee to verify its price," is sufficient for a price realism analysis, and that conducting an investigation as to feasibility is not required when not otherwise specified. In Electronic Hardware Corporation, the agency had a concern about price realism

Judges of this court have consistently held that "an agency 'may' perform price realism analyses 'on competitive fixed-price-type contracts' . . . and the '[r]esults of the analysis may be used in performance risk assessments and responsibility determinations.'" Mil-Mar Century Corp. v. United States, 111 Fed. Cl. at 541 (quoting FAR 15.404–1(d)(3) (footnote omitted)); see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 356.  Indeed, the FAR states that a cost realism analysis for fixed-priced contracts "may be used in performance risk assessments and responsibility determinations." See FAR § 15.404–1(d)(3) (2013) (emphasis added).  As stated in Information Sciences Corp. v. United States:

> The balance of the FAR guidance in [48 C.F.R. § 15.404–1(d) ](3) contains most of the elements of sound guidance on price realism presented in a somewhat muddled fashion. However, we can paraphrase it more clearly by stating that a price realism analysis indicating that an offeror's price is very low can be used in three ways: (1) To assess an offeror's understanding of the work[;] (2) To assess the degree of performance risk posed by the low price[;] (3) To determine whether the offeror is a responsible contractor.

Info. Scis. Corp. v. United States, 73 Fed. Cl. at 102 (modifications in original).  Therefore, if appropriate, a price realism analysis can be used as a means by which a contracting officer can examine, and make a determination, on the offeror's understanding of the requirements of the solicitation, an offeror's nonresponsibility, and/or performance risk resulting from a low price.

In the above captioned protest, the Solicitation does not detail what is required for the anticipated price realism analysis, as the Solicitation only stated "[t]he Total Contract Life Price will be evaluated for completeness, accuracy, reasonableness and realism, using the techniques in FAR 15.404-1(b)(2)."  The Solicitation also states:

1) The RFP requires firm-fixed-prices contract line items. A price reasonableness approach will be utilized by the Government to determine that the proposed prices offered are fair and reasonable and that a "buy-in" or unbalanced pricing between CLINs or Option Periods is not occurring. In evaluating price reasonableness, other than cost and pricing

---

between two competing offerors, and asked the two offerors to "[p]lease verify that these prices are correct for price realism."  See Elec. Hardware Corp., 2005 WL 3681971, at *4 (internal citation omitted) (internal quotation omitted).  In Electronic Hardware Corporation, the GAO concluded that the verification procedure was sufficient, and indicated, "nor is an agency required to investigate in the context of a price realism analysis whether Grauch [the awardee] can deliver the items for the prices proposed as required by the resultant contract." Id. (citing Citywide Managing Servs. of Port Washington, Inc., B–281287.12, 2000 WL 33121998 (Comp. Gen. Nov. 15, 2000) (internal quotations omitted)).

data, may be requested and utilized if the Contracting Officer cannot determine reasonableness through initially submitted pricing information. Indications of potential underbidding or unbalanced pricing will be reflected in the cost/pricing report and may impact the ratings for non-price factors as such indications may be determined to indicate a lack of understanding of the requirement.

2) The Government will examine price proposals for artificially low unit prices. Offers found to be unreasonably high, unrealistically low (an indication of "buy–in"), or unbalanced, may be considered unacceptable and may be rejected on that basis.

As a result, the contracting officer's price realism evaluation, at a minimum, should have examined whether the offered unit prices were unrealistically high or low and whether an offeror understood the requirements of the Solicitation. At issue, therefore, is whether the price realism analysis directed by the Solicitation, and undertaken by the procurement officials, as referenced and considered by the contracting officer, was arbitrary, capricious or an abuse of discretion.  See 5 U.S.C. § 706(2)(A); see 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); see also Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085 (Fed. Cir.) (An agency's "action must be upheld as long as a rational basis is articulated and relevant factors are considered."), reh'g and reh'g en banc denied (Fed. Cir. 2001).

Defendant argues that the Air National Guard addressed the Solicitation's price realism analysis requirement concerning buy-in through the questions included in the Source Selection Evaluation Board's April 2, 2013 questionnaire.  Defendant states "[t]he SSEB specifically asked the offerors about the license-related pricing issue that FCN has raised in its complaint."[39]  Defendant also states "RGS directly addressed the concern by confirming that it understands the ANG's requirement and is not 'buying in' by offering a low initial price intending to seek additional money for licenses later."  The April 2, 2013  questionnaire also asked the offerors to confirm that the entire population

[39] The defendant did not address the fact that the April 2, 2013 questionnaire gave the offerors in the competitive range only two hours to respond to the multiple issues raised in the April 2, 2013 questionnaire, seemingly an unreasonably short amount of time. The April 2, 2013 questionnaire, in addition to requiring the offerors to calculate the number of licenses in their proposals and requiring the assumption of all risks with the licenses, asked, "[i]f costs are figured with the idea that licensing is covered by GFE; will the vendor provide in writing and signed by the appropriate government official proof of such claim."  As discussed above, although FCN, RGS, and [redacted] responded, it took RGS until June 5, 2013 to provide Mr. Rau's statement to the agency, therefore, the procurement officials could not have considered his statement prior to selecting RGS for the contract award.  The short amount of time to respond to the April 2, 2013 questionnaire is another example of the agency willing to act on incomplete information when it selected RGS.

of the Air National Guard would be covered at all times, and if the offeror will "assume ALL RISKS with licensing issues." (capitalization in original). RGS' response indicated that it had conferred with its subcontractor, AtHoc, as well as the Air Force, and understood that the Air National Guard's total population may fluctuate. RGS also responded that, "RGS will assume ALL RISK with licensing issues related to this contract effort, and the ANG will NOT be charged/billed in any way for additional licensing throughout the life (POP) of this contract, including Base plus any Option Years beyond the cost/price proposal submitted in response to this solicitation." (capitalization in original). RGS' proposal also discussed in detail how the RGS/AtHoc telephone system was to operate. Further, in its price proposal, RGS indicated that it would add [redacted] lines to the listing [redacted] lines.

Defendant maintains that the "solicitation did not assign the price-realism analysis to either the SSA or the SSEB," and, therefore, it was acceptable for the Source Selection Evaluation Board, not the contracting officer, to have conducted the inquiry. Although defendant admits that "RGS has no authority to commit the Air Force, or any Government entity, to transfer or 'reallocate' software licenses to the ANG," defendant maintains that since RGS agreed to bear the risk of all licensing issues in its response to the Source Selection Evaluation Board's April 2, 2013 questionnaire, "[t]he ANG did not overlook the potential risk in RGS's proposal."

FCN argues, however, that although the Source Selection Evaluation Board recognized the price realism issue, at least with regard to transferability of licenses, "[t]he RGS-AtHoc response to this question [in the April 2, 2013 questionnaire] was wholly inadequate and should have been found inadequate under any proper price realism analysis." In particular, the protestor argues that RGS only provided one unrelated contract from one Air Force command, which appeared to provide for capability to transfer licenses in that contract. As FCN correctly points out, "the contract is not even in the name of either RGS or AtHoc as prime contractor." According to the protestor, otherwise there was "no 'official proof' of such licenses, their quantity, availability, documented transferability," provided to the Air National Guard. The protestor maintains that the e-mail from Mr. Bartoli, a civilian employee of the Air Force Materiel Command, to Mr. Holmes, the contract specialist, is insufficient to establish that the Air Force had adequate licenses available for the over 108,436 members of the Air National Guard. Moreover, as indicated above, the Source Selection Evaluation Board may not have read Mr. Bartoli's e-mail before the Source Selection Evaluation Board came to its selection decision, as it was submitted at 9:23 p.m. on the day the decision was made. The protestor also argues that, regardless, the Air National Guard did nothing to ensure the realism of RGS' offer to share access to the telephony capability to be contracted for with the United States Air Force, "or whether the share [sic] use would interfere either with the functioning of either the Air Force alerting system, or the NGB Air Guard alerting system," or impact the price if all or some of RGS' offered government-furnished property was not available.

The contracting officer was very terse when he stated in the source selection decision document: "I found that five of the six price proposals that included options to

be realistic." The Federal Circuit has stated that "[c]ontracting officers are not obligated by the APA to provide written explanations for their actions." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1337-38; Ne. Military Sales, Inc. v. United States, 100 Fed. Cl. at 110; Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. at 113. The test, however, is whether there is a reasonable basis within the record. See Orion Tech., Inc. v. United States, 704 F.3d at 1351; Weeks Marine, Inc. v. United States, 575 F.3d at 1371; CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1356 (Fed. Cir. 2008); see also Emery Worldwide Airlines, Inc. v. United States, 264 F.3d at 1085. Prior decisions have upheld the use of questions to offerors as follow-up verification by which to satisfactorily perform a price realism analysis. See Elec. Hardware Corp., 2005 WL 3681971, at *4 (internal citation omitted). It would appear that the contracting officer's decision, as the source selection official, was not carefully documented or explained, and only met the very minimum requirements of how to conduct the buy-in component of price realism analysis dictated by the Solicitation, and neither RGS nor the agency understood whether government-furnished property would be available, and if so in sufficient quantities.

As discussed above, RGS' proposal and response to the April 2, 2013 questionnaire indicated its intention to use government-furnished equipment. As indicated by the Source Selection Evaluation Board, RGS' proposal implements "cost savings for utilizing existing GFE," and reduces "the ANG total cost of ownership." The Source Selection Evaluation Board also stated "RGS Federal Inc.'s proposal showed an exceptional approach to the requirement there is the possibility of a cost saving to the government." Nowhere in the Solicitation, however, was there any reference to government-furnished property or to FAR Part 45. Moreover, as explained above, there are numerous requirements, pursuant to FAR Part 45, that the government must follow if an offeror is to use government-furnished property. An offeror with a clear understanding of the Solicitation would note those absences and recognize that government-furnished property was not contemplated by the Solicitation. If government-furnished property was available, it should have been available to all offerors, and the Solicitation should have so indicated in order to allow for an open and fair competition.

There remain serious unanswered questions as to whether the licenses and telephony equipment offered by RGS were government property, and available in sufficient quantities to meet the requirements of the Solicitation, and, therefore, whether the agency could have conducted a proper price realism evaluation. The Air National Guard source selection official could not be sure that when conducting the price realism analysis, he was not making "irrational assumptions or crucial miscalculations," by disregarding the potential impact of the undetermined availability and quantity of the government-furnished property offered by RGS. See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. at 541 (quoting Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 358 (quoting OMV Med., Inc. v. United States, 219 F.3d at 1344)). RGS' reliance on government-furnished property, without having received supporting contract language or reliable and timely verification by the Air Force to indicate these items were available to the Air National Guard, creates a concern that RGS did not properly address the requirements of the contract, and that RGS would not be able to meet the

requirements of the contract at the price offered.  The record suggests that RGS was offering only possibly transferrable or existing software, licenses and telephony capability to meet the contract requirements, without a full understanding of the offer it had submitted to the government, making, a proper price realism evaluation by the government equally unattainable.

RGS' Pricing Information in its Mission Capability Proposal

The third protest ground FCN alleges is that the Air National Guard failed to penalize RGS for allegedly violating the Solicitation's submission requirements regarding no pricing information to be included with the mission capability proposal. The protestor, quoting from the Source Selection Evaluation Board's Technical Evaluation Summary, adds that the Source Selection Evaluation Board "is not permitted to review and evaluate pricing information 'except to determine the reasonableness of the cost in relation to the technical merits of the proposal.'"  According to FCN, however, RGS included pricing information in its mission capability proposal by stating that its software licenses would be offered at "no-cost," and that the telephony hardware would be provided at "a fraction of the cost it would take ANG to develop it on its own." (internal quotations omitted).  The protestor claims that the Source Selection Evaluation Board relied on this pricing information in its technical evaluation.  According to FCN, the Source Selection Evaluation Board stated that the RGS proposal implements "cost savings for utilizing existing GFE," and reduces "the ANG total cost of ownership." According to the protestor, the Source Selection Evaluation Board also stated "RGS Federal Inc.'s proposal showed an exceptional approach to the requirement there is the possibility of a cost saving to the government."

Defendant maintains that "[t]he statements that FCN cites do not, in fact, contain substantive pricing information, such as unit prices or rates, but merely describe RGS's overall strategy."  According to defendant, "[t]he SSEB evaluation of RGS's proposal noted 'cost savings for utilizing existing GFE,' but the SSEB did not assign a strength on that basis."  Defendant also claims that the Solicitation was vague because it allowed offerors to "propose '[l]everaging existing resources/capabilities to achieve program objectives.'"  Defendant further argues that if RGS is found to have violated this provision of the Solicitation, FCN did so as well because "FCN's mission capability volume repeatedly stated that FCN would 'leverage' or 'maximize' the ANG's 'investment to date' in Desktop Alert."  Finally, defendant alleges that any violation in this regard should be considered *de minimis* at worst, because the "[t]he contracting officer deemed the top three offerors' solutions equal in technical merit," and "did not double-count RGS's price as a strength."

The Solicitation states, in bold font, that "**No pricing information is to be provided in the Mission Capability Volume**."  (emphasis in original).  The Solicitation, however, instructed offerors to discuss other items in the mission capability proposal that could touch on cost.  For example, the Solicitation instructed offerors that, "[a]t a minimum, the proposal will identify the . . . overall business approach."  Further, the Solicitation at issue instructed offerors to include a "[d]emonstration of experience in the

ability to control cost and schedule," and to provide examples of when it "implemented novel solution arrangements in order to better meet effort/requirements and create efficiencies in the previous three (3) years."  Additionally, the Solicitation provided that one of the "**Considerations**" was an offeror's "[*l*]*everaging existing resources/capabilities to achieve program objectives*," although the Solicitation did not mention in what particular proposal volume this was to be discussed.  (emphasis in original).  Therefore, RGS' statements within its mission capability proposal that its solution is cost-efficient or will reduce cost, can be seen as complying with the Solicitation's instructions.  Similarly, the statements by RGS, that it will it will provide software licenses at "no cost for ANG," web training "at no additional cost," and access to [redacted] telephone lines "at no additional cost," in its mission capability proposal also can be considered strategy statements, as no component price numbers or a total price were included.

The Source Selection Evaluation Board, at least twice, mentioned cost in their overall review of both RGS' and [redacted's] proposals, first stating that the proposal provides "an enterprise solution reducing the ANG total cost of ownership," and "cost savings for utilizing existing GFE."  Second, the Source Selection Evaluation Board stated that they based their assessments on "mission capability, performance history and cost."  The contracting officer, as the source selection official, in his supplement affidavit to the GAO indicated that the instruction in the Solicitation "and the well-accepted meaning in Government contracting, is that actual prices of the offeror's solutions are not to be disclosed in the non-price portion of the proposal.  That did not happen here.  I do not find RGS's mission capability proposal to have run afoul of the prohibition on disclosing pricing information in the solicitation."  The court finds RGS did not violate the Solicitation's instructions on pricing information, but, in any event, the minimal mentions of pricing strategy would be considered by this court *de minimis*.  See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011).  The court also notes that FCN's hands are not clean in this matter, as FCN stated in its mission capability proposal that its centrally hosted installation approach will "incur no additional configuration costs."  Moreover, FCN also stated in its mission capability proposal that use of Desktop Alert "[m]aximize[s] ANG resource investments to date by leveraging the in place Desktop Alert NCAS, infrastructure, interfaces, and training."

Prejudice

Having determined that the agency acted arbitrarily and capriciously and in violation of 5 U.S.C. § 706(2)(A), by neglecting to investigate or understand whether or not government-furnished property was available for use or available in sufficient quantities indicated in the RGS and [redacted] proposals, before awarding the contract to RGS, the court proceeds to the second step of the bid protest analysis, "to determine, as a factual matter, if the bid protester was prejudiced by that conduct."  Bannum, Inc. v. United States, 404 F.3d at 1351; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1326; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367 ("To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process.  See

Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). 'To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.' Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show 'that there was a substantial chance it would have received the contract award but for that error.' Statistica, 102 F.3d at 1582.").

Defendant claims that even if the Air National Guard acted arbitrarily and capriciously FCN was not prejudiced. Defendant argues that, even if RGS' proposal contained government-furnished property, FAR Part 45 merely requires that the Air National Guard should have leveled the playing field to the extent RGS had an advantage, by adjusting RGS' price or informing others of the AtHoc capability. Defendant alleges that RGS in fact obtained no advantage from its pricing strategy, since "FCN's proposal included [redacted] more telephone lines for [redacted] less per year."[40]  Defendant also alleges that, even if FCN had known about the availability of AtHoc's package, it could not have benefited from this advantage "because FCN is not an AtHoc authorized reseller." According to defendant, any harm from RGS' reliance on government-furnished property to provide the software or hardware is not prejudicial. Defendant also argues that, "[t]o the extent that RGS is offering government equipment in its proposal, FCN also is offering government equipment in its proposal, because it is leveraging -- in FCN's words -- these [redacted] licenses for Desktop [Alert] that were purchased under a prior contract."  According to defendant, "FCN's theory is that the ANG should have recognized and accepted the advantage that FCN offered through its ability to use Desktop Alert licenses purchased through contract W9133L-09-F-0139, but the ANG should have neutralized the similar advantage that RGS offered through its ability to provide IWSAlerts licenses at 'no cost.'" Defendant also argues that "[b]ecause both RGS and FCN proposed to use software licenses the Government has already purchased, software assurance and technical support were the majority of the work and costs in both firms' proposals."

According to FCN's mission capability proposal, FCN's proposal leveraged Desktop Alert software licenses previously granted to the Air National Guard.  Even if FCN's proposal contained government-furnished property, which neither the agency, nor counsel for the defendant in this court, could affirmatively establish, it would not have prevented FCN from having a substantial chance of contract award because the amount of government-furnished property may have been significantly less than that offered by RGS or [redacted], making FCN's proposal potentially more cost effective for the government.

FCN argues that it was prejudiced because had the government considered the requirements of FAR Part 45, there was a substantial chance it could have awarded FCN the contract, regardless of whether or not the government concluded that RGS'

---

[40] The court notes that the price that RGS proposal charged for its telephony capability, [redacted], was more than the price FCN charged for its telephony offering, [redacted], in its price proposal.

proposal relied on government property.  The protestor also argues that the use of government-owned telephony equipment in this instance adds to the risk of performance.  Furthermore, the protestor argues that had the Air National Guard determined that the items were government furnished-furnished property, but unavailable or burdened by the requirements of FAR Part 45, "it should be apparent to all that the basis for the RGS [redacted] discount collapses."  As discussed above, compliance with FAR Part 45 requires more than a contracting officer doing a price adjustment or notifying others of the availability of government property.  The contracting officer also must examine the technical and project-level risks associated with using government property, which could affect an offeror's technical evaluation. See FAR §§ 45.102(b), 45.103(a), 45.202(b). If the government believed that the software was excluded from coverage by FAR Part 45, no such indication appears in the evaluations or selection decision.

In the Solicitation at issue in this protest, in which the non-price evaluation factors were more important than price, and the contracting officer found the FCN, RGS, and [redacted] proposals "truly equal in my view in terms of their non-price factor ratings," any adjustment to RGS' or [redacted's] technical evaluation, including as a result of a FAR Part 45 analysis, could have raised RGS' and [redacted's] price and impacted which offeror should be awarded the contract.  Additionally, the FCN and RGS proposals each charged over [redacted] for access to the telephony capabilities, just in the base year, although no information was given as to how much of the following year sustainment charges relate to this feature.  RGS puts the list price of the [redacted] discounted [redacted] telephone lines at [redacted], allegedly "[o]wned" by the United States Air Force, and allegedly to be made available to the Air National Guard.  Since FCN appears to have offered a [redacted] through its [redacted], there is reason for the court to question whether, if a rental price were to be placed on the RGS lines, under FAR Part 45, RGS' total price could have risen above FCN's total price.  Price was a highly relevant distinguishing factor between offerors, and the contracting officer stated in his debriefing letter to FCN that, "in light of the relative equivalence of your proposal and the awardee's proposal, the significantly lower price submitted by RGS tipped the scales clearly in their favor."  Therefore, there is a substantial chance that, if the RGS proposal relied on government-furnished property, FCN could have been awarded the contract at issue.

Another issue for consideration is whether FCN can claim prejudice despite having submitted a proposal priced higher than that submitted by [redacted], whose proposal was rated technically equal to that of FCN and RGS on all non-price evaluation factors and above the other offerors.  FCN alleges that this issue is irrelevant, since "[e]ach offeror ahead of FCN [RGS and [redacted]] employed a similar pricing strategy based on the same subcontractor's prior sale of software licenses to the U.S. Air Force and proposed to use existing government property in the performance of its contract." Therefore, according to FCN, any fault by the Air National Guard in its contract review process would impact both RGS and [redacted], potentially leaving FCN in line for the award.  Defendant does not, and cannot, offer an argument in opposition.  It appears from the record that [redacted] proposed a similar strategy as that offered by RGS, for a

lower-cost solution by leveraging AtHoc resources allegedly contracted to the United States Air Force. Both the RGS and the [redacted] proposals, according to the Source Selection Evaluation Board, "were practically the same due to their choice in sub-contractor (AT-HOC) was [sic] supplying the end solution." In addition, RGS and [redacted] submitted virtually identical responses to the April 2, 2013 questionnaire and attached the same sample contract. During the GAO protest, the Air National Guard stated in its supplemental report:

> The Guard has not proposed to award the contract to the second-rated offeror . . . . The reason is that the second-ranked offeror proposed the same software solution as did RGS. Thus, if the GAO sustained FCN's protest or supplemental protest, the Guard would not make an award to the second-ranked offeror.

In sum, if the RGS proposal were to be deemed more costly or ineligible by the Air National Guard, the same concerns likely would preclude an award to [redacted]. FCN would have a substantial likelihood to receive a contract award under the Solicitation and, therefore, FCN has met the prejudice requirement.

Permanent Injunction

FCN has moved for a permanent injunction against the implementation of the Air National Guard contract W9133L-13-P-0034 awarded to RGS. The protestor argues that, in addition to the merits of its claims discussed above, the public interest favors an injunction because it would maintain the public trust in the integrity of the federal acquisitions system. The protestor also argues it will suffer irreparable harm because it will have no other remedy to recover the benefits awarded to RGS under the contract. FCN also argues that the harm to the government and third parties from the issuance of an injunction is low, given the benefit the government will receive by preserving the integrity of the federal acquisition system. Defendant did not offer a rebuttal, or address the merits of injunctive relief, either in its filings or at the hearing.

In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff

who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); MVS USA, Inc. v. United States, 111 Fed. Cl. 639, 649 (2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 494 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d at 1037) (citation omitted). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. at 369 (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well." (citing PGBA, LLC v. United States, 389 F.3d at 1228-29)). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427 [(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010).

In the above captioned protest, as discussed above, the protestor has established success on the merits by demonstrating that the government failed to sufficiently investigate, or understand, whether or not RGS had relied on government-furnished property as part of their proposals. Regarding whether or not the protestor will suffer irreparable injury if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 245 (2012) (citing several cases); Magnum Opus Tech., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'") (internal citations omitted).

There is an established line of bid protest decisions holding that the loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm.  Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.")); motion to amend denied, 94 Fed. Cl. 553 (2010); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828.  According to a Judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." BINL, Inc. v. United States, 106 Fed. Cl. at 49 (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 696 (2012))); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 552–53 (2011).  The reasoning behind this line of decisions is that, in an action at law, the disappointed bidder can only recover bid protest costs, not lost profits, which would not fully compensate the protestor.  See Serco Inc. v. United States, 81 Fed. Cl. at 501–02 (finding irreparable harm because the only allowed monetary recovery, bid preparation costs, would not fully compensate the plaintiff).  The protestor claims that "FCN has been denied an opportunity to perform this contract based upon an unreasonable and unsupportable evaluation of proposals and award decision to RGS. If FCN cannot perform, then it will not have any remedy at law to recover the contract rights, benefits, and revenue accruing to the new contractor. Neither this Court nor any other court can repair this damage or repay this loss."  Moreover, the loss of the contract represents not only irreparable injury in terms of lost profit, but also in terms of lost experience working with the government.  See BINL, Inc. v. United States, 106 Fed. Cl. at 48 ("Irreparable harm is established by a lost opportunity to fairly compete."); see also Magnum Opus Tech., Inc. v. United States, 94 Fed. Cl. at 544.

Assessing the balance of hardships, the court recognizes the possible burden placed on the Air National Guard by delaying contract performance for an updated Mass Notification System.  Nonetheless, "[w]ith respect to the delay that the government states is likely to occur, the Court of Federal Claims has observed that '"only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests."'"  CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715–16 (2006) (quoting Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 399)); see also Insight Sys. Corp. v. United States, 110 Fed. Cl. at 582.

Regarding the public interest factor, "'[t]e public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.'"  CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. at 663); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. at 289; United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.")) (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); PCI/RCI v. United States, 36 Fed. Cl. 761, 776 (1996) (holding that the public interest in protecting the integrity of the

procurement system from irrational conduct was served by granting a permanent injunction); see also Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993)); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying violations of law."). While there is a public interest in continuing to develop the Mass Notification System for the Air National Guard as soon as practicable, this interest is overcome by the public interest in conducting the Air National Guard's solicitation in compliance with the law and the FAR. An important public interest is served through conducting "honest, open, and fair competition" under the FAR, in which all proposers have access to the same information, including the possible availability of government-furnished property, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. Because the protestor has demonstrated success on the merits regarding significant failures in how the procurement was conducted, leading to an arbitrary and capricious selection process, and because the equitable factors weigh in the protestor's favor, a permanent injunction to RGS' performance of contract W9133L-13-P-0034 is warranted and awarded.

## CONCLUSION

After a review of the record before the court, the protestor's motion for judgment on the administrative record is **GRANTED**. Defendant's cross-motion for judgment on the administrative record is **DENIED**. Based on the record before the court, the court cannot resolve the incomplete and contradictory assertions regarding reliance on government-furnished property in the winning proposal, the availability of such government property and whether the contracting officer, as the source selection official, understood the status of the government property proposed at the time he selected RGS for the award. Therefore, the court sustains FCN's protest and remands to the agency to clarify the Solicitation and conduct a proper procurement. The Clerk of Court shall enter a permanent injunction regarding the award and implementation of contract W9133L-13-P-0034, and enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**